DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission, | ) | |
| | ) | CASE NO. 4:10 CV 2287 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Complete Developments, LLC, et al, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Majestic Enterprises Collision Repair, Inc., et al., | ) | |
| | ) | |
| | ) | |
| Relief Defendants. | ) | |

Pending before the Court is plaintiff's motion pursuant to Rule 55(b)(2) of the Federal Rules of Civil procedure for an entry of judgment by default against defendants Complete Developments, LLC; Investment International Inc.; Kevin Harris; Keelan Harris and Karen Starr (collectively, Defendants), and against relief defendants Majestic Enterprises Collision Repair, Inc. and UCAN Overseas Corporation, S.A. (collectively Relief Defendants).[1] ECF 77.

For the reasons that follow, plaintiff  U.S. Commodity Futures Trading Commission's motion for default judgment against Defendants Complete Developments, LLC; Investment

_____

[1] Defendants Global Strategic Marketing and Patrick Cole have appeared and are defending against plaintiff's complaint, and plaintiff does not seek default judgment against them.  Relief defendant RAK Palace Rent-a-car is also not a subject of plaintiff's motion for default judgment.

(4:10 CV 2287)

International Inc.; Kevin Harris; Keelan Harris and Karen Starr, and against Relief Defendants Majestic Enterprises Collision Repair, Inc. and UCAN Overseas Corporation, S.A., is GRANTED.

## I.  BACKGROUND

The complaint in this case was filed on October 7, 2010.  Plaintiff U.S. Commodity Futures Trading Commission's (Commission) complaint is complex because the alleged scheme is complex.  Basically, plaintiff claims that the Defendants violated the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2006), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 (CRA)), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), by operating a Ponzi scheme with funds solicited from the public for the purported purpose of trading off-exchange foreign currency contracts (forex).  Plaintiff further alleges that the Relief Defendants Majestic Enterprises Collision Repair, Inc. and UCAN Overseas Corporation, S.A., received funds to which they were not entitled derived from Defendants' fraudulent acts, and therefore must return those funds.

The Clerk entered default against Keelan Harris and Karen Starr on April 27, 2011 (ECF 24); against Complete Developments LLC, Investment International Inc, and Kevin Harris on January 25, 2011 (ECF 18); and against Majestic Enterprise Collision Repair, Inc. and UCAN Overseas Corporation S.A. on January 25, 2011 (ECF 18).  The Defendants and Relief Defendants have not sought to set aside the entry of default against them, have not attempted to dispute or defend against the allegations in the complaint, and have not otherwise appeared in this action.

2

(4:10 CV 2287)

Plaintiff subsequently moved for default judgment.  In support of the motion, plaintiff submitted a brief (ECF 77-1); the declaration of Michael C. McLaughlin (ECF 77-2); the transcript of the sentencing hearing for Kevin Harris and criminal judgment against Kevin Harris in *United States v. Kevin Harris,* Northern District of Ohio Case No. 4: 10 CR 437) (ECF 77-3 and 77-4); a disgorgement calculation prepared by plaintiff as to the relief defendants (ECF 77-5); and a supplemental declaration by Michael C. McLaughlin (ECF 81).  Defendants and Relief Defendants have not opposed or otherwise responded to plaintiff's motion for default judgment.

## II.  STANDARD OF REVIEW

Motions for default judgment are governed by Rule 55(b) of the Federal Rules of Civil Procedure.  Upon the clerk's entry of default against a defendant, "the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven." *Arthur v. Robert James & Associates Asset Management, Inc.,* 2012 WL 1122892 (S.D. Ohio) (quoting *Morisaki v. Davenport, Allen & Malone, Inc.,* 2010 WL 3341566 at * 1 (E.D. Cal.) (citing *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.,* 772 F.2d 1319, 1323 (7th Cir.1983))); Federal Rule of Civil Procedure 8(b)(6).  Even assuming the truth of plaintiff's factual allegations, however, the Court must still determine whether the facts alleged in the complaint are sufficient to state a claim for relief as to the cause of action for which plaintiff seeks default judgment.  *J & J Sports Productions, Inc. v. Rodriguez*, 2008 WL 5083149 at *1 (N.D. Ohio) (citation omitted).

Even if the Court determines to grant default judgment on the issue of liability, the Court must conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.

3

(4:10 CV 2287)

*Alterna Mortg, Income Fund, LLC v. GS Holdings-Brookside, Ltd.,* 2012 WL 5897578 at * 1

(S.D. Ohio) (citing, *Osbeck v. Golfside Auto Sales, Inc.,* 2010 WL 2572713 at * 5 (E.D. Mich.)).

In order to ascertain the amount of damages, Rule 55(b)(2) permits, but does not require, a

district court to conduct a hearing.  *Vesligaj v. Peterson*, 331 Fed. Appx. 351, 354-55 (6th Cir.

2009).  Instead of a hearing, a district court may rely on affidavits submitted by the moving party

on the issue of damages.  *Schilling v. Interim Healthcare of Upper Ohio Valley, Inc.,* 2007 WL

152130 at *2 (S.D. Ohio).

 The entry of default judgment lies within the sound discretion of the Court.  *Ohio &*

*Vicinity Carpenters' Fringe Benefit Funds, Inc. v. BCS Contractors, Inc.,* 2013 WL 623574 at *

1 (N.D. Ohio).  The Court has already determined that the Defendants and Relief Defendants are

in default.  Having considered the Complaint (the factual allegations of which are well-pleaded

and taken as true), the memorandum, affidavits, and exhibits submitted by plaintiff in support of

its motion, and being familiar with the record in this matter, the Court makes the findings of fact

and conclusions of law that follow.

### III.  JURISDICTION AND VENUE

 1. This Court has jurisdiction over this action pursuant to Section 6(c)(a) of the Act,

7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person

whenever it shall appear to the Commission that such person has engaged, is engaging, or is

about to engage in any act or practice constituting a violation of the Act or any rule, regulation,

or order thereunder.

(4:10 CV 2287)

2.      As discussed below, the Commission has jurisdiction over the conduct and transactions at issue in this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, and Section 2(c)(2)(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C).

3.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that the Defendants are found in, inhabit, or transact business in this District, and acts and practices in violation of the Act, as amended by the CRA, as alleged in the complaint, have occurred, are occurring, or are about to occur within this District.

### IV.  ADMITTED ALLEGATIONS OF FACT

**A.  The Parties**

1.      Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with responsibility for administering and enforcing the provisions of the Act, as amended by the CRA, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq*. The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

2.      Defendant Complete Developments LLC (CDL) is a North Carolina limited liability company that was incorporated in July 2006 by Kevin Harris and another individual. In October 2006, CDL was also incorporated in Delaware as a limited liability company. At all relevant times, CDL's principal place of business was in Warren, Ohio and it had an office in Toronto, Ontario, Canada, and was engaged in the business of soliciting and accepting funds from individuals to trade forex on their behalf. CDL has never been registered with the Commission in any capacity.

5

(4:10 CV 2287)

3.      Defendant Investment International Inc. a/k/a/ I3 Incorporated (I3) is an Ohio corporation incorporated in November 2007 by Keelan Harris and Starr. At all relevant times, I3 and CDL shared  common business addresses in Warren, Ohio and Toronto, Ontario, Canada.  I3 was engaged in the business of soliciting and accepting funds from individuals to trade forex on their behalf. I3 has never been registered with the Commission in any capacity.

4.      Defendant Kevin Harris is an individual who resides in Warren, Ohio. He is the President and CEO of CDL, a signatory on bank accounts of CDL and I3, and participated in soliciting and accepting funds from individuals to trade funds in managed accounts that were instead pooled for the purpose of trading forex on their behalf. He had no training or experience in forex trading. Kevin Harris has never been registered with the Commission in any capacity. Kevin Harris has been convicted of various criminal offenses including receiving property under false pretenses in North Carolina in 2007 and complicity to commit arson in Ohio in 1996. He filed for bankruptcy in 2003, and there were multiple state and federal tax liens entered against him. None of this information was ever disclosed to customers of CDL and I3.

5.      Defendant Karen Starr (Starr) is a Canadian citizen whose last known residential address was in Barrie, Ontario, Canada. It is believed that Starr currently resides in the United Arab Emirates. Starr is a Director of I3, and she participated in soliciting and accepting funds from individuals to trade forex in managed accounts that were instead pooled for the purpose of trading forex on their behalf. Starr has never been registered with the Commission in any capacity.  Starr was convicted of fraud in Canada in 1997. Her fraud conviction was never disclosed to customers of CDL and I3.

6

(4:10 CV 2287)

6.     Defendant Keelan Harris, the brother of Kevin Harris**,** is an individual whose last known address was in Warren, Ohio. It is believed that Keelan Harris currently resides in Columbia, South America. Keelan Harris is the President and CEO of I3, a signatory on bank accounts of CDL and I3, and he registered a website operated by CDL. Keelan Harris has never been registered with the Commission in any capacity.  Keelan Harris has been convicted of various criminal offenses including conspiracy to commit credit card fraud in this Court in 1998, identity theft in this Court in 2004, and breaking and entering and grand theft in Ohio also in 2004, none of which was ever disclosed to customers of CDL and I3.

7.     Relief Defendant Majestic Enterprises Collision Repair, Inc. (Majestic) is an Ohio corporation incorporated in March 1998 by Kevin Harris. Its principal place of business is in Warren, Ohio. At all relevant times, Majestic Enterprises provided auto body repair services.

8.     Relief Defendant UCAN Overseas Corporation S.A. (UCAN) is a Panamanian company incorporated in January 2008. UCAN operated from CDL and I3's Warren, Ohio office and also had an office in Zhangjiagang, China. UCAN marketed construction materials such as drywall for use in residential and commercial construction.  UCAN is owned and operated by Keelan Harris, Kevin Harris and Starr.

(4:10 CV 2287)

**B.  Background**

       1.      CDL began soliciting customers in or about November 2006 for the purported purpose of trading off-exchange forex.  I3 was incorporated in November 2007 and began soliciting customers at or about that time for the purported purpose of trading off-exchange forex.  2.      From in or about November 2007, both CDL and I3 solicited customers and accepted investment funds until in or about October 2008.  CDL and I3 offered investments in what they characterized as "professionally managed" accounts to trade off-exchange foreign currency contracts.

       3.      The accounts ranged in duration from three to twelve months, and customers were told they would receive guaranteed monthly interest of from 5% to 12% (annualized returns of 60% to 144%).  CDL and I3 customers were required to invest in increments of $1,000 and in certain minimum amounts, depending on the duration of their account. Generally, CDL and I3 required a minimum investment of $10,000 for a three month account, $20,000 for a six month account, and $50,000 for a twelve month account. Existing customers received a commission of 2% of the original amount invested by those they referred.

       4.      CDL and I3 provided prospective customers, and existing customers when they re-invested, with various documents describing their managed forex investment programs, including a "Managed Forex Account Application" and a document entitled "Terms and Conditions of Participation."

8

(4:10 CV 2287)

5.      Customers were required to fax their completed application and the signed Terms and Conditions of Participation to CDL or I3, which had the same fax number. The application form required customers to select the length of time for which they were investing and the amount of their investment, and to provide their bank account information.

6.      Customers then received an email from the applicable firm acknowledging receipt of their application and providing information for them to wire transfer their investment to a CDL or I3 bank account. After the wire transfer was made, the applicable firm sent the customer an email setting forth the dates the customer would receive interest payments and the date their original investment amount would be repaid. These emails were usually sent by Starr or by employees under her direction.

7.      Hundreds of individuals invested in CDL and I3.  More than $ 23 million dollars was invested.  Within a year or two, it was over.  CDL and I3 ceased operations in October 2008.

**C.  Fraudulent Solicitation**

1.      In soliciting customers, Defendants CDL, I3, Kevin Harris and Starr made or caused to be made false representations including that they would trade forex on their customers' behalf, that customers would receive guaranteed monthly interest of between 5% and 12%, and that at least 80% of the amount customers invested would be guaranteed against loss, and omitted to disclose material facts including that Kevin Harris, Keelan Harris and Starr had been convicted of criminal offenses including fraud.

9

(4:10 CV 2287)

2.      CDL and I3 provided prospective customers, and existing customers when they re-invested, with various documents describing their managed forex investment programs, including a "Managed Forex Account Application" and a document entitled "Terms and Conditions of Participation."  The "Terms and Conditions of Participation" that CDL and I3 provided to prospective customers, and to existing customers seeking to have them roll-over their investments, contained misrepresentations, including that "[t]he Principal will be repaid with the last interest Payout," and that "Eighty percent (80%) of the Principal is guaranteed in the case of losses."

3.      CDL investment seminars were conducted to solicit customers.  Kevin Harris and Starr attended the investment seminars, and documents describing CDL's investment programs and promotional brochures were distributed to prospective customers at the investment seminars. During the seminars various misrepresentations were made to prospective customers both verbally and through written solicitation materials, such as that CDL offered managed accounts whereby customers would deposit funds with CDL and those funds would be used by Kevin Harris to trade forex on the customers' behalf; that CDL maintained a trading account at Interbank FX, a registered futures commission merchant ("FCM"); that interest would be paid out of funds earned trading forex; that customers would be repaid the original amount of their investment with their final interest payment; and that 80% of their original investment was guaranteed against loss.

10

(4:10 CV 2287)

4.    However, neither CDL nor I3 had an account at Interbank FX or any similar corporate trading account. The only accounts in which forex trades were conducted were personal accounts of Kevin Harris and Starr at Interbank FX and Oanda, registered FCMs, into which funds received from CDL and I3's customers were transferred and virtually all of which were lost trading forex. The fact that CDL and I3 customer funds were used for Kevin Harris and Starr's personal forex trading was never disclosed to the customers, nor was their inexperience in forex trading.

5.    Kevin Harris hired an accountant from Warren, Ohio, who was not a CPA and could not certify audit reports, to produce a report that could be used to establish the credibility of CDL's programs with prospective customers.  The accountant issued a letter which contained various misrepresentations, including that "CDL trading strategies does [sic] not expose more than 20% of funds in the Brokerage Account to trading risks;" that "Customers funds are segregated in different accounts from CDL's corporate funds;" that "CDL has always met all its interest payment commitments and repaid all customers principals [sic] since it started offering services approximately one year ago;" and that "monthly interest payments are paid out of funds earned from currency trading and not from new customers' funds." The letter concluded by claiming that CDL's operation is not a 'Ponzi scheme.'"

6.    The representations in the accountant's letter were false. Neither CDL nor I3 had a corporate account for trading currencies or any similar "brokerage account." The only forex trading that occurred was in the personal trading accounts of Kevin Harris and Starr. CDL and I3

11

(4:10 CV 2287)

customers relied upon the misrepresentations and omissions in the accountant's letter secured by Kevin Harris in deciding to invest, reinvest and remain invested with CDL and I3.

**D. Misappropriation of Customer Funds**

1.      When investing with CDL and I3, customers were directed to deposit their funds into one of CDL or I3's various bank accounts, over which Kevin and Keelan Harris had signatory authority.  Between November 2006 and in or about October 2008, customers invested by depositing funds into CDL's accounts and, between in or about November 2007 and in or about October 2008, by depositing funds into I3's accounts. Customers invested at least $23, 236,897.27 in CDL's and I3's investment programs.  Although customers were told that 80% of their investment was guaranteed against loss, customer funds were actually not protected against loss and at least $15, 776,617.91of the funds invested by CDL and I3 customers were not returned to them.

2.      Relief Defendants Majestic and UCAN were owned and operated by Kevin and Keelan Harris and Starr.  Majestic and UCAN received $302,277.35 and $768,000, respectively, from CDL and I3.  The funds received by Majestic and UCAN from CDL and I3 were funds of CDL and I3 customers to which Majestic and UCAN had no legitimate entitlement.

3.      In or about July 2008, CDL and I3 ceased making payments to customers, despite customers' repeated demands.  CDL and I3 sent various communications to customers misrepresenting why payments had stopped.  In a letter to its customers dated August 27, 2008,

12

(4:10 CV 2287)

CDL stated that it had "suspended all trading" due to "banks not being cooperative when it comes to pooling of funds to trade currency." The letter stated that CDL had "been advised to get out of currency trading all together. Immediately!" It further stated that CDL was "putting together a strategy that will allow us to return all funds to members without exposing our accounts to the type of scrutiny that will get them shut down."

    4.    In October 2008, CDL and I3 stated in emails to customers that they could not pay interest and that over 70% of funds invested by customers had been "lost." CDL stated in an email to customers that it had transferred its remaining funds "off-shore" and the funds would be distributed to customers by an unidentified "third-party." At the end of October 2008, CDL sent an email to customers stating that its bank accounts had been "involuntarily closed" on October 28, 2008 and that CDL was ceasing operations. CDL and I3 stopped communicating with customers in or around March 2009.

**E.  Kevin Harris, Keelan Harris and Starr Controlled CDL and I3**

    1.    Kevin Harris was CDL's President and CEO and ultimately responsible for all operations of CDL and I3. Among other actions, Kevin Harris executed agreements on behalf of CDL, was a signatory on CDL and I3 bank accounts, approved CDL and I3 solicitation materials, solicited and accepted funds from customers to trade in CDL and I3's "managed accounts," communicated with CDL and I3 customers concerning their investments, and attended meetings at which prospective customers were solicited.

13

(4:10 CV 2287)

2.      Keelan Harris was I3's President and CEO, registered CDL's website, made payments to CDL and I3 customers of purported interest, paid CDL and I3 business expenses with customer funds, and issued checks to GSM, Kevin Harris, Starr and himself from CDL and I3 bank accounts that contained customer funds.  Both Kevin and Keelan Harris opened bank accounts for CDL and I3 and had signatory authority and controlled these accounts.

3.      Starr was a director of I3 and managed CDL and I3's office in Toronto, Canada. Starr approved CDL and I3 solicitation materials, participated in soliciting and accepting funds from customers to trade forex in CDL and I3 accounts,  sent e-mails to CDL and I3 customers opening their accounts, and communicated with customers concerning their investments. Starr also introduced GSM, which became CDL's exclusive marketing agent, to Kevin Harris.

4.  Kevin Harris, Keelan Harris and Starr all participated in the scheme to defraud CDL and I3 investors.

## V.  CONCLUSIONS OF LAW

### A.  The Commission has Jurisdiction over the Transactions and Conduct at Issue

Under Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) , as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CRA), §§ 13101-13204, 122 Stat. 1651, the Commission has jurisdiction over forex transactions if three criteria

14

(4:10 CV 2287)

are met:[2] 1) the transactions are offered or entered into (i) with a person that is not an "eligible

contract participant," defined by Section 1a(2) of the Act, 7 U.S.C. § 1a(12) to include, among

other things, certain individuals with net assets of more than $5 million, and (ii) on a leveraged

or margin basis or financed by the offeror, counterparty, or a person acting in concert with either

the offeror or counterparty; 2) the transactions do not result in actual delivery of foreign currency

within two days or otherwise create an enforceable obligation to make or take delivery; and 3)

neither the counterparty to the transactions nor the defendant is one of certain enumerated

persons, i.e., a financial institution, a broker-dealer, futures commission merchant or associated

person thereof, an insurance company or regulated subsidiary or affiliate thereof, or an

investment bank holding company.

    In this case, all of the above criteria are met with respect to the forex transactions offered

to customers by CDL and I3.  First, because the forex transactions were offered to the general

public, most or all of CDL and I3's customers were not "eligible contract participants" as

defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12).  Further, CDL's and I3's terms and

conditions of participation in CDL's and I3's purported to offer forex transactions to customers

on a leveraged basis.  Second, because large amounts of customer funds were misappropriated

rather than traded on the forex market, the transactions did not result in the actual delivery of

foreign currency.  Third and last, neither the Defendants nor counterparties to the purported

---

    [2] With the CRA, when these criteria are met the Commission does not need to prove that
a foreign currency contract is a futures contract in order to establish antifraud jurisdiction, and
the courts no longer have to decide if forex transactions meeting those criteria are futures
contracts in order to permit the Commission to pursue an action for fraud.

(4:10 CV 2287)

forex transactions were a financial institution, a broker-dealer, futures commission merchant or

associated person thereof, an insurance company or regulated subsidiary or affiliate thereof, or

an investment bank holding company.

Accordingly, the Court concludes that the Commission has jurisdiction over the

transaction and conduct at issue in this case pursuant to the Act as amended by the CRA.

**B.  Defaulting Defendants Kevin and Keelan Harris**

 **and Starr Violated Sections 4b(a)(2)(A) and (C) of the Act**

In its motion for default judgment, the Commission argues that defaulting Defendants

Kevin Harris, Keelan Harris, and Starr violated Section 4b(a)(2)(A) and (C) of the Act.  The

Court concludes that defaulting Defendants violated Section 4b of the Act.

Section 4b(a)(2) of the Act, as amended by the CRA, makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction  subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than or subject to the rules of a designated contract market -
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person; . . .[or]
>
> (C) willfully to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for . . the other person . . .

16

(4:10 CV 2287)

1.      Fraud by Misappropriation

The  facts in the complaint reflect that the defaulting Defendants CDL. I3, Kevin

Harris and Starr  misappropriated customer funds by using those funds to pay "interest" to other

customers and for their own personal use.  CDL and I3 customers invested $15,776,617.91 that

were invested for trading forex, but never returned.  Misappropriation of customer funds

constitutes "willful and "blatant" fraud in violation of Sections 4b(a)(2)(A) and (C) of the Act.

*U.S. Commodity Futures Trading Commission v. PMC Strategy, LLC,* --- F.Supp.2d --- , 2012

WL 5185823 *6 (W.D.N.C.) (citing *CFTC v. Noble Wealth Data Info Servs., Inc.,* 90 F.Supp.2d

676, 687 (D. Md. 2000), *aff'd in relevant part sub nom., CFTC v. Baragosh*, 278 F.3d 319 (4th

Cir. 2002), *cert. denied*, 537 U.S. 950 (2002) (defendants violated Sections 4b(a)(2)(i) and (iii)

(the predecessors to Sections 4b(a)(2)(A) and (C)) by diverting investor funds for operating

expenses and personal use); [extensive citations to same effect omitted]).

Accordingly, the Court concludes that defaulting Defendants CDL. I3, Kevin

Harris and Starr violated Section 4b of the Act by misappropriating customer funds.

2.      Fraud by Misrepresentations and Omissions

In order to establish a violation of Section 4b the Act, as amended by the CRA,

for fraud by misrepresentation and omission, the Commission must prove that the defaulting

Defendants made: 1) a misrepresentation, misleading statement or deceptive omission; 2) with

*scienter*; and 3) the misrepresentation, misleading statement or deceptive omission was material.

*United States Commodity Futures Trading Commission v. Capital Street Financial*, 2012 WL

17

(4:10 CV 2287)

79758 at *6 (W.D.N.C.) (citations omitted); .  As shown below, the admitted facts reflect that

through their misrepresentations and omissions, CDL, I3, Kevin Harris and Starr violated

Section 4b of the Act , as amended by the CRA. *United States Commodity Futures Trading*

*Commission v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002); *United States*

*Commodity Futures Trading Commission v. Carnegie Trading Group, Ltd.*  450 F.Supp.2d 788,

797-798 (N.D. Ohio) (to establish claim for fraud under Section 4b of the Act, Commission must

demonstrate defendant made material misrepresentation or omission of fact with *scienter*).

> a.  *CDL, I3, Kevin Harris and Starr Made Misrepresentations and*
> *Omissions to Customers and Prospective Customers of CDL and I3*

Kevin Harris and Starr both approved CDL's and I3's Terms and Conditions of

Participation and Risk Disclosure statement (Complaint, ¶ 37 and Exhibits 2 and 3) and

brochure. Complaint, ¶ 52 and Exhibit 4;Complaint¶¶ 71 and 74. These exhibits to the complaint

made false claims in soliciting investors, including that:

- CDL and I3 provided professionally managed forex accounts;
- investors would receive interest at rates ranging from 5% to 12% per month;
- 80% of the principal invested was guaranteed against loss;
- investors' principal would be returned at the end of their investment period.

The documents failed to disclose that Kevin Harris, Keelan Harris and Starr were convicted

criminals and had no experience in forex trading. Complaint ¶¶5, 40, 45.

As part of his plea agreement, Kevin Harris admitted that CDL and I3 operated as a Ponzi

scheme and that any amounts represented to be "interest" paid by CDL and I3 came from the

(4:10 CV 2287)

customer's own funds or the funds of other customers, to perpetuate the false impression that actual forex trading occurred. ECF 69, Attachment 2, Plea Agreement ¶ 24.

> b. CDL, I3, Kevin Harris and Starr's Misrepresentations
> and Omissions Were Material

"A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald and Co.*, 310 F. 3d 1321. 1328-1329 (11th Cir.); *SEC v. Gagnon,* 2012 WL 994892 *9 (E.D. Mich. March 22, 2012).

Representations regarding profit potential and level of risk are material as a matter of law. *CFTC v. Noble Wealth Data Information Services, Inc.*, 90 F. Supp. 2d 676, 686 (D.Md. 2000); *Carnegie Trading Group, Ltd.,* 450 F. Supp.2d at 800. False statements about traders' backgrounds and experience are material, *CFTC v. Commonwealth Fin. Group, Inc.*, 874 F. Supp. 1345, 1353-1354 (S.D. Fla. 1994), as are false statements about the existence of a trading account and whether trades are being conducted on behalf of the investors. *CFTC v. Weinberg,* 287. F. Supp. 2d 1100, 1106-7 (C.D. Cal. 2003.); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447-8 (D. N.J. 2000).

CDL, I3, Kevin Harris and Starr made misrepresentations concerning CDL and I3's purported managed forex accounts, high profit potential, limited level of risk, and the background and experience of CDL and I3's principals. Account documents provided to investors, and approved by Kevin Harris and Starr, misrepresented that "[t]he Principal will be repaid with the last interest Payout, and that "Eighty percent (80%) of principal is guaranteed in

(4:10 CV 2287)

the case of losses." Complaint, ¶ 45, Exhibits 2 and 3. CDL's brochure also falsely claimed that

the only risks were that a "[b]ad trade would wipe out 20 % of principal...since [a]t any given

time no more than twenty (20%) percent of funds will be used in trading." Complaint, Exhibit 4.

### c. CDL, I3, Kevin Harris and Starr Acted With <u>Scienter</u>

*Scienter* is established "when representations are made intentionally or with reckless

regard of the truth." *Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d at 801. Thus, *scienter* can be

established if the defendant "intended to defraud, manipulate, or deceive, or if Defendant's

conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald &*

*Co.*, 310 F. 3d at 1328. "Highly unreasonable omissions or misrepresentations" that "present a

danger of misleading [customers] which is either known to the Defendant or so obvious that

Defendant must be aware of it," suffice to establish the requisite state of mind. *Id., citing Ziemba*

*v. Cascade Int'l Inc.*, 256 F. 3d 1194, 1202 (11th Cir. 2001) (internal quotation omitted).

CDL, Kevin Harris and Starr knew the representations made to investors in CDL and I3's

investment programs were false, or acted with reckless disregard as to whether their statements

were true or false. Kevin Harris and Starr were involved from the start of CDL and I3's Ponzi

scheme, approving CDL and I3 account documentation and soliciting and accepting funds to

purportedly trade forex in CDL and I3 managed accounts. Complaint, ¶¶22, 24, 71 and 74. These

defendants knew that neither firm had an account to trade forex and could not pay the promised

returns. Complaint, ¶¶ 3, 5, 44. Kevin Harris and Starr knew that they did not have any

(4:10 CV 2287)

experience trading forex; they were aware of their own criminal backgrounds. Complaint ¶¶ 22-25.

Kevin Harris arranged for an "audit letter" to be prepared to convince investors the investment program was not a Ponzi scheme. Complaint ¶ 48. When pleading guilty to criminal charges, Kevin Harris admitted he knew he was operating a Ponzi scheme and making misrepresentations to customers. ECF 69, Attachment 2, Plea Agreement at ¶24.

Given their extensive involvement, Kevin Harris and Starr either knew that the representations made to market CDL and I3's investment programs were false, or acted with reckless disregard to the truth or falsity of those representations, and so possessed the requisite *scienter*.

### 3. Kevin Harris, Keelan Harris and Starr are Liable for CDL and 13's Violations as Controlling Persons Pursuant to Section 13(b) of the Act.; CDL and I3 are Liable for Kevin Harris, Keelan Harris and Starr's Violations Pursuant to Section 2 (a) (1) (B) of the Act as They Acted Within the Scope of their Office or Employment

As controlling persons of CDL and I3, Kevin Harris, Keelan Harris and Starr are liable for CDL and I3's violations of the Act pursuant to Section 13 (b) of the Act, 7 U.S.C.§13c (b). "A fundamental purpose of [S]ection 13(b) is to allow the (CFTC) to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself." *In re JCC, Inc.*,[1992-1994 Transfer Binder] Comm. Fut. L. Rep. CCH ¶ 26,080 at 41, 576 (CFTC May 12,1994) *aff'd sub nom JCC, Inc.v. CFTC*, 63 F. 3d 1557 (11th Cir 1995).

(4:10 CV 2287)

A controlling person is "[a]ny person who, directly or indirectly, controls any person who has violated any provision of the Act [if that controlling person] did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b). To establish controlling person liability, the CFTC must "demonstrate that a defendant actually exercised general control over the operation of the entity principally liable and possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d at 802 (internal quotation omitted). Defendants cannot avoid liability by claiming ignorance when they have deliberately or recklessly avoided knowledge of potential wrongdoing, "Knowing inducement" may be shown by constructive knowledge, upon CFTC's showing that the defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *JCC, Inc*., 63 F. 3d at 1569.

Kevin Harris, Keelan Harris and Starr were controlling persons of CDL and I3 who went beyond knowingly inducing the violations; they actively committed these violations while acting within their corporate capacity. Kevin Harris was CDL's President and CEO, had signatory authority over CDL and I3 bank accounts, approved CDL and I3 account documentation and solicitation materials and was responsible for the CDL and I3 Ponzi scheme. Complaint ¶¶ 22 and 72. Keelan Harris was I3's CEO and President, paid CDL and I3 customer's "interest" from CDL and I3 bank accounts; used customer funds to pay CDL and I3 expenses and issued checks to Kevin Harris, Starr and to himself. Complaint ¶¶26 and 73.  Starr managed CDL and I3's office in Toronto, Canada, approved CDL and I3's solicitation materials, sent e-mails to

22

(4:10 CV 2287)

customers opening their accounts, and communicated with customers concerning their investments. Complaint ¶¶ 24 and 74.

Because Kevin Harris, Keelan Harris and Starr controlled CDL and I3 and participated in the violations of the Act, they are liable for CDL and I3's violations. Because the acts, misrepresentations and failures of Kevin Harris, Keelan Harris and Starr occurred within the scope of their office or employment with CDL and I3, CDL and I3 are liable for Kevin Harris, Keelan Harris and Starr's violations pursuant to Section 2 (a) (1) (B) of the Act.

**C. Relief**

1. Permanent Injunctions Against CDL, I3, Kevin Harris, Keelan Harris and Starr

Upon a showing that a violation of the Act has occurred and there is a reasonable likelihood of future violations, the district court is empowered to enforce compliance with the Act by taking "such action as is necessary to remove the danger of violation," including imposition of a permanent injunction against future violations. *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F. 2d 573, 583 (9th Cir. 1982). A court may issue such a statutory injunction without considering traditional equitable factors such as inadequacy of other remedies or irreparable harm. *CFTC v. Hunt*, 591 F. 2d 1211, 1220 (7th Cit. 1979), *cert. denied*, 442 U.S. 921 (1979).

The FCTC has established that the default defendants violated the Act and the widespread and repeated violations by CDL, I3, Kevin Harris, Keelan Harris and Starr show a pattern of fraudulent behavior over time, creating a reasonable likelihood of future violations. Based on the

23

(4:10 CV 2287)

showing in this matter, the Court enters a permanent injunction against the defaulting defendants enjoining them from:

1. Engaging, directly or indirectly, in any activity that violates Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2) (A)-(C);

2. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006);

3. Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1 (b) (1), 17 C.F.R.§32.1(b)(1) (2009)) ("commodity options"), and/or foreign currency (as described in Section 2(c)(2)(C)(I) of the Act)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

4. Having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

5. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

6. Soliciting, receiving, or accepting any funds from any person for purposes of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

24

(4:10 CV 2287)

7. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R.§§)(9) (2009); and

8. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R.§ 3.1(a) (2009)), agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R.§4.14(a)(9) (2009).

## 2. Restitution to Investors

In a civil enforcement action pursuant to Section 6c of the Act, 7 U.S.C. 13a-1, the Court may order equitable relief, including ordering defendants to make full restitution to the investors who lost funds as a result of violations of the Act by defendants. *United States v. Universal Mgmt. Servs., Inc.*, 191 F. 3d 750, 760-761 (6th Cir. 1999).

In a parallel criminal matter, the Honorable Lesley Wells found that CDL and I3 had a total of 408 customers, and that 286 customers are still owed restitution. ECF 77-2 at 1326. In a sentencing hearing on March 1, 2012, Judge Wells determined that funds totaling $15,776,617.91 were owed to CDL and I3's customers. ECF 77-2 at 1326, ECF 77-3 at 1384, 1386; ECF 77-4 at 1399-1411. The restitution payees, and the amount owed each, is set forth in the judgment in the criminal case, a copy of which has been filed in this action as ECF 77-4.

25

(4:10 CV 2287)

Because each of the defaulting defendants participated in the solicitation scheme to defraud these investors, the defendants should be jointly and severally liable for the $15,776,617.99 restitution award.. *CFTC v. Millenium Trading Group, Inc*., 2007 WL 2639474, *12 (E.D. Mich Sept. 6, 2007). Any restitution paid by Kevin Harris pursuant to the Criminal Judgment shall offset the restitution obligation of this order. Any funds recovered from the defaulting defendants shall be used to pay restitution to investors before funds collected are applied to the civil monetary penalties ordered herein.

### 3. Civil Penalties

Under the Act and CFTC Regulations, the Court may impose a civil monetary penalty of $130,000 for each violation committed before October 22,2008 and $140,000 for each violation committed after October 23, 2008, or triple the amount of a defendant's monetary gain. 7 U.S.C.§ 13a-1(d)(1)(A) (2006; regulations 143.8 (a)(2)(iii) and (iv), 17 C.F.R.§143.8 (a) (2) (iii) and (iv). The purpose of such sanctions is to "further the [Act's] remedial policies and to deter others in the industry from committing similar violations." *Reddy v. CFTC,* 191 F. 3d 109, 123 (2d Cir. 1999). The Court has broad equitable jurisdiction to fashion a penalty appropriate to the gravity of the offense and the need for deterrence. *Miller v. CFTC*, 197 F. 3d 1227, 1236 (9th Cir 1999); *CFTC v. Levy*, 541 F. 3d 1102, 1112 (11th Cir. 2008).

Looking to the monetary gain by defendants, CFTC has alleged that approximately $400,000 was used for personal expenses by Kevin and Keelan Harris, and Starr received payments of approximately $250,000. And additional $1.9 million was withdrawn from the CDL

26

(4:10 CV 2287)

and I3 accounts in cash, and is otherwise unaccounted for; the Court will assume the cash was used for personal gain. Using these numbers the civil monetary penalties are as follows:

- Keelan Harris: $200,000 + (1/3 of $1.9 million)= $833,333 monetary gain, tripled= $2.49 million;

- Kevin Harris: $200,000 + (1/3 of $1.9 million)= $833,333 monetary gain, tripled=$2.49 million

- Starr: $250,000 + (1/3 of $1.9 million)=$ 883,333 monetary gain, tripled=$2.64 million.

This results in a total civil penalty of  resulting in a total civil penalty of $7.42 million.  While this is not a penalty in the range desired by the CFTC, these sums can only be paid after full restitution of $15,777,617, for which the defendants are jointly and severally liable, and are in addition to the money defendants' companies are ordered to disgorge (approximately $1 million).

4. Disgorgement from Relief Defendants

A relief defendant who received ill-gotten funds does not have a legitimate claim to the funds. *CFTC v. Foreign Fund,* 2008 U.S. Dist. Lexis 10667 at *3 (D. Tenn., Feb. 12, 2008). Michael C. McLaughlin's declaration establishes that CDL and I3 customers deposited their funds into accounts, and that Majestic Enterprises received $302,277.35 and UCAN received $768,000 from these accounts. ECF 772 at 1327. Majestic Enterprises is ordered to disgorge

(4:10 CV 2287)

$302,277.35 and UCAN to disgorge $768,000. These amounts should be applied to restitution ordered for investors.

## V. CONCLUSION

To summarize this Memorandum Opinion, judgment was entered against the Defaulting Defendants on the following bases:

(A) Kevin Harris, Keelan Harris, and Starr violated Sections 4b(2)(A) and (C) of the Act.

(B) CDL and I3 violated Sections 4b(2)(A) and (C ) of the Act; Keelan Harris, Kevin Harris and Starr controlled CDL and I3 and are therefore are liable the violations of the Act by CDL and I3.

(C) Keelan Harris, Kevin Harris and Starr violated Section 4b of the Act while acting within the scope of their office or employment with CDL and I3 and CDL and I3 are therefore liable for their acts, misrepresentations, omissions and failures pursuant to Section 2 (a) (1) (B) of the Act.

(D) CDL, I3, Kevin Harris and Starr made misrepresentations and omissions to customers and prospective customers of CDL and IC that were material, and made with intent to defraud and deceive, or with reckless regard for the truth.

(E) Relief Defendants UCAN and Majestic Enterprises received CDL and I3 customer investment funds, and did not have a legitimate claim to the funds.

28

(4:10 CV 2287)

As relief the Court orders:

I.  CDL, I3, Kevin Harris, Keelan Harris and Starr, are permanently enjoined from:

1. Engaging, directly or indirectly, in any activity that violates Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2) (A)-(C);

2. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006);

3. Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1 (b) (1), 17 C.F.R.§32.1(b)(1) (2009)) ("commodity options"), and/or foreign currency (as described in Section 2(c)(2)(C)(I) of the Act)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

4. Having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

5. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

6. Soliciting, receiving, or accepting any funds from any person for purposes of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

29

(4:10 CV 2287)

7. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R.§§)(9) (2009); and

8. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R.§ 3.1(a) (2009)), agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R.§4.14(a)(9) (2009).

II  CDL, I3, Kevin Harris, Keelan Harris and Starr shall pay restitution to investors in the amount of $15, 776,717.99.

Because each of the defaulting defendants participated in the scheme, the defendants are jointly and severally liable to pay  restitution. The restitution payees, and the amount owed each, are set forth in the criminal judgment entered by the Honorable Judge Wells in Kevin Harris's case, a copy of which has been filed in this action as ECF 77-4. Any amounts paid in satisfaction of the restitution order in the criminal matter will be credited toward payment of this civil judgment as well

III. Keelan Harris, Kevin Harris and Starr shall pay civil penalties as follows:

Keelan Harris: $2.49 million;

Kevin Harris: $ 2.49 million; and

30

(4:10 CV 2287)

Starr $2.64 million.

Any amounts received in payment from Keelan Harris, Kevin Harris or Starr shall be used to pay restitution first, and only upon the satisfaction of the restitution award, be applied toward the payment of civil penalties.

IV. The Relief Defendants shall disgorge the amounts received from CDL and I3 investors. Majestic Enterprises shall disgorge $302,277.35 and UCAN $768,000. All amounts disgorged shall be used to pay restitution to investors.

The Court will prepare a Judgment Entry memorializing these rulings, which will be filed simultaneously with this Memorandum Opinion.

IT IS SO ORDERED.

 May 8, 2013                                          s/ David D. Dowd, Jr.
Date                                                 David D. Dowd, Jr.
                                                     U.S. District Judge

31