DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission, | ) | |
| | ) | CASE NO. 4:10 CV 2287 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION AND |
| v. | ) | ORDER |
| | ) | |
| Complete Developments, LLC, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Majestic Enterprises Collision Repair, Inc., et al., | ) | |
| | ) | |
| Relief Defendants. | ) | |

Before the Court is plaintiff's Renewed Motion for Summary Judgment against Global

Strategic Marketing, Inc. (GSM) and Patrick Cole (Cole) (collectively, the defendants) (ECF 97),

supported by a supplemental statement of undisputed facts (ECF 97-2) and the affidavit of

Michael C. McLaughlin (ECF 98).[1]  Plaintiff's renewed motion for summary judgment was filed

on July 17, 2013, and defendants' response was due August 2, 2013.  ECF 96.  No response to

plaintiff's renewed motion for summary judgment was filed by either GSM or Cole.

This case was scheduled for trial in October if the case survived summary judgment.

After reviewing the plaintiff's motion and exhibits in support thereof, the Court determined that

plaintiff was entitled to judgment as a matter of law and vacated the trial order.  ECF 99.  The

---

[1] Defendants Global Strategic Marketing and Patrick Cole, and relief defendant RAK Palace Rent-A-Car, are the only defendants remaining in the case.

(4:10 CV 2287)

Court issued this order in advance of its memorandum opinion and judgment entry granting plaintiff's summary judgment motion as a courtesy to counsel who were undertaking trial preparations.

However, before the Court published its memorandum opinion and judgment entry, the Court received a letter from defendant Patrick Cole regarding what he claimed was his counsel's failure to file a response to plaintiff's renewed motion for summary judgment. As a consequence of that letter, the Court granted leave until October 7, 2013 for defendants to show cause why a response to plaintiff's motion was not timely filed and to request leave to file a response instanter. ECF 100. Defendants' counsel filed an explanation regarding failure to timely oppose plaintiff's summary judgment motion and the Court, in its discretion, permitted defendants to file their opposition instanter. ECF 102, 103 and 104. Plaintiff filed a reply. ECF 106.

The Court has carefully examined the defendants' opposition to plaintiff's renewed motion for summary judgment and the evidence advanced in support thereof. For the reasons that follow, plaintiff's renewed motion for summary judgment against defendants GSM and Patrick Cole is GRANTED.

BACKGROUND

A.    UNDISPUTED FACT SUMMARY

The undisputed factual background of this case was extensively detailed in the Court's opinion ruling on plaintiff's previous motion for summary judgment. Briefly, the undisputed background facts are as follows.

2

(4:10 CV 2287)

From January 2007 until approximately July 2008, defendant Complete Developments LLC (CDL) solicited and accepted millions of dollars from the general public for the purported purpose of trading off-exchange foreign currency (forex).  CDL was located in Warren, Ohio, and its principals were Kevin Harris, Keelan Harris, and Karen Starr.[2]

In November, 2006, defendant Patrick Cole met with Kevin Harris and Karen Starr about marketing CDL's forex investment programs to the public as a "wealth building" opportunity. As Patrick Cole testified in his deposition:

Q:    . . . "I was interested to learn of the potential for wealth building and financial growth for me and my family."  What do you mean by that?

A:    I wanted to make a difference in my life and my son's life.

Q:    So you thought it would make you money?

A:    Yes.

. . .

Q:    . . . "I asked if they were paying referral commissions and she [Starr] said yes."

A:    Yes.

Q:    So at this point she [Starr] told you if you introduced or referred other people you would get paid?

A:    Yes.

Q:    An then you continued speaking with Ms. Starr and you proposed that we develop a marketing plan if we could be compensated?

---

[2] As later discussed, it is undisputed that CDL's forex program was a Ponzi scheme. Kevin Harris is presently serving a prison sentence.  Keelan Harris has been charged and is in custody.  Karen Starr has been charged but is believed to have fled the country.

(4:10 CV 2287)

> A:    Yes.
>
> Q:    So you were interested in marketing CDL if it would – if you would get paid for it?
>
> A:    Yes.

ECF 110, pp. 62-64.

Cole, a Canadian citizen, has a three year diploma in mechanical engineering from the College of Arts, Sciences and Technology in Kingston, Jamaica, and a BA in computer science from York University in Toronto.  Cole incorporated GSM for the purpose of marketing CDL's forex programs.  GSM is a Canadian corporation with its principal place of business in Mississauga, Ontario.  Cole was GSM's president, chief executive officer, and chairman of the board, and GSM's principal contact with CDL.

GSM marketed CDL's forex investments to the public pursuant to an exclusive agency agreement between GSM and CDL.  Cole signed the agreement on behalf of GSM and Kevin Harris signed the agreement on behalf of CDL.  Under the agreement, GSM received a commission from CDL on funds invested by customers and an enhanced commission on funds invested by customers who were referred to CDL by GSM.[3]

The commissions received from CDL were GSM's only source of income.  GSM does not dispute that over $23,000,000 was invested in CDL's forex programs or that GSM received approximately $1,200,000 from CDL in commissions and referrals.

---

[3] GSM received a 3% commission on all funds invested by CDL customers, and an additional 5% commission on funds invested by CDL customers who were referred by GSM.

4

(4:10 CV 2287)

GSM, primarily Patrick Cole, prepared the documents used by GSM to market CDL's forex trading program.  These documents included a power point presentation describing CDL's forex programs, a promotional brochure, CDL account application, and risk disclosure document. These documents were presented and provided to the attendees of the investment seminars conducted by GSM to market CDL's forex programs.  All of GSM's seminars marketing CDL programs and the materials distributed were "essentially the same" as the GSM presentation on January 18, 2007, which was videotaped and is part of the undisputed record in this case.[4]  ECF 57-9.  The next seminar was conducted in early March 2007.

The materials that GSM prepared regarding CDL's forex programs were distributed and presented to potential investors at GSM's investment seminars.  GSM made approximately 12 such presentations between January 2007 and November 2007.  Approximately 25-30 potential investors attended each presentation.  A few additional presentations were also made to smaller groups.  GSM stopped making public presentations in November 2007 when GSM discovered such presentations were illegal in Canada, but maintained its relationship with CDL and continued to collect referrals and commissions.[5]

---

[4] According to Cole, the presentation in January 2007 was made by GSM personnel to friends as a trial presentation before GSM was formed.

[5] According to Cole's deposition testimony, sometime in November 2007, months after GSM began publicly marketing CDL's forex programs, GSM learned that such marketing was illegal because GSM was not licensed to market securities, and under Canadian law, forex trading was considered trading in securities.  After learning that marketing CDL's forex programs was illegal under Canadian law, GSM "just wanted to drop out of site" and stopped making public solicitations for CDL's forex programs.  Although GSM's solicitations for CDL's forex programs were illegal, GSM continued (continued)

(4:10 CV 2287)

The presentations were made by GSM's principals, primarily Patrick Cole.  Among other things, the following statements and information were communicated by GSM to potential investors at the presentations: 1) CDL was a company with "professional" forex traders, a "conservative trading philosophy" and "disciplined risk management," and a "team . . . of traders, analysts and market watchers"; 2) 80% of investors' principal was guaranteed against loss "even if the sky falls"; 3) investors would receive monthly interest payments of 7-12% made from funds earned and not new customers' funds; 4) CDL "never failed to pay interest or return principal"; 5) CDL and GSM were "committed to full disclosure"; 6) CDL's forex programs were not a "scam"; and 7) GSM had done its "homework" regarding CDL's forex investment programs.

GSM and it principals received significant monetary benefits from GSM's relationship with CDL.  In addition to receiving approximately $1,200,000 in commissions and referrals from CDL, GSM and its principals invested in CDL's forex programs at a preferential guaranteed interest rate of 15% per month in a six month program.  GSM invested approximately $95,000 and received approximately $86,382 in interest.  Cole invested approximately $200,000 in CDL's forex programs and received approximately $180,891 in interest.  Potential investors were told by GSM that GSM received a commission on funds invested in CDL's forex programs, but were not told the amount of the commissions and  interest that GSM and its principals received from CDL.

_____

(continued)  to service CDL customers and invoice CDL for commissions until May or June 2008.  ECF 110, pp. 41-43.

6

(4:10 CV 2287)

It is undisputed that the statements made by GSM and Cole regarding CDL's forex programs were false.  In truth, CDL's forex program was a Ponzi scheme.  Around July 2008, CDL stopped paying its customers, and in October 2008, CDL notified its customers that their funds had been "lost."  According to Cole, GSM was as surprised as anyone else to learn that CDL was a Ponzi scheme.

Patrick Cole's role with respect to GSM and CDL is undisputed.  Cole has stipulated that he was the leader of GSM throughout its corporate existence.  Cole is the GSM's chairman of the board, president, and chief executive officer.  Cole led GSM's board meetings, was a signatory on GSM's bank accounts, and had a corporate credit card.  Cole signed contracts on GSM's behalf.  Cole arranged for GSM's office space, computers, and corporate e-mail.  GSM board meetings were typically held at Cole's home.  With respect to CDL, Cole testified in his deposition that he was the "point person" for negotiation and execution of the contract between GSM and CDL, and the principal developer of GSM's presentations regarding CDL's forex programs.

B.    PROCEDURAL SUMMARY

Plaintiff alleges in its complaint that GSM violated Sections 4b(a)(2)(A) and (C) of the Commodity Exchange Act (the Act)[6] as amended by the Food, Conservation and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 (the CRA)), §§ 13101-13204, 112 Stat. 1651.  To establish liability for fraud under these sections, plaintiff must

---

[6] 7 U.S.C. § 6b(a)(2).

7

(4:10 CV 2287)

show: 1) the making of a misrepresentation, misleading statement, or a deceptive omission; 2) materiality; and 3) scienter.  *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002); *CFTC v. Carnegie Trading Group, Ltd.*, 450 F.Supp.2d 788, 797-98 (N.D. Ohio 2006). The *scienter* element requires proof that defendants made false representations intentionally or with reckless disregard for the truth.  *Carnegie Trading Group,* 450 F.Supp.2d at 801.

Plaintiff also alleges that Cole is liable for GSM's violations of the Act as GSM's "controlling person" under Section 13 (b) of the Act.[7]  This section states, "the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."  To establish controlling person liability, plaintiff must demonstrate that the defendant exercised general control over the entity principally liable for the violation of the Act, and that the defendant possessed the power or ability to control the activity upon which the primary violation is based.  *Carnegie Trading Group*, 450 F.Supp.2d at 802.

Plaintiff's initial motion for summary judgment against GSM and Cole was denied. ECF 80.  In denying that motion, the Court found that it was undisputed that CDL was a Ponzi scheme and that defendants GSM and Cole made material and false statements and representations when soliciting investors for CDL.  However, plaintiff's motion was denied because the Court could not conclude as a matter of law, based on the record at that time, that in making such material misrepresentations, GSM or Cole acted with scienter.  ECF 80.

---

[7] 7 U.S.C. § 13c(b).

8

(4:10 CV 2287)

When plaintiff deposed Cole before filing plaintiff's initial summary judgment motion, Cole asserted his Fifth Amendment privilege and declined to answer questions about GSM and GSM's marketing of CDL's forex programs to potential investors.  Nevertheless, Cole submitted an affidavit in opposition to plaintiff's initial motion for summary judgment that addressed certain topics for which he had asserted his Fifth Amendment privilege in his deposition. Plaintiff moved to strike Cole's affidavit.  The Court denied plaintiff's initial summary judgment motion because, based on the record at that time, plaintiff had not established it was entitled to judgment as a matter of law.  The Court reached this conclusion without consideration of Cole's affidavit, and plaintiff's motion to strike was denied as moot.  ECF 80.

After the Court denied plaintiff's initial motion for summary judgment against GSM and Cole, a status conference was scheduled to discuss: 1) the possible waiver/withdrawal of Cole's invocation of his Fifth Amendment right to remain silent; and 2) modifications to the discovery and case management schedule to mitigate prejudice to plaintiff from any such waiver/withdrawal.  As a consequence of that status conference, plaintiff was granted leave to serve a Fed. R. Civ. P. 30(b)(6) notice, and the deposition of Cole, both individually and as a Rule 30(b)(6) witness for GSM, was conducted.  These depositions, which were conducted after the Court denied plaintiff's initial motion for summary judgment, are now part of the record in this case from which the Court may determine whether a genuine dispute exists as to material facts relevant to the issue of scienter.  ECF 86.

9

(4:10 CV 2287)

Plaintiff was granted leave to file a renewed summary judgment motion following this discovery, and response and reply dates were established.  ECF 86.  Plaintiff timely filed its renewed motion for summary judgment, which is presently before the Court.  Defendants ultimately filed an opposition, as described above.  With GSM's Rule 30(b)(6) and Cole's deposition testimony now part of the record, the Court is able to determine whether there is a genuine dispute regarding material facts relevant to scienter, or whether plaintiff is entitled to judgment as a matter of law.

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

The questions presented in plaintiff's renewed motion for summary judgment against GSM and Cole are whether: 1) the undisputed facts establish that defendant GSM acted with scienter when it made multiple material misrepresentations when soliciting investors for CDL's forex programs, which proved to be a Ponzi scheme, thereby violating Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2); and 2) the undisputed facts establish that defendant Cole, as president of GSM and chairman of GSM's board, did not act in good faith, or knowingly induced GSM's violation of the Act, and is therefore liable for GSM's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

In response, defendants frame the issues as follows: "This case will be decided on one central issue: whether Defendants GSM and Cole intentionally or recklessly made false representations."  Defendants argue that summary judgment is inappropriate because there is a genuine dispute as to the following material facts: 1) whether defendants made false statements without due diligence in the face of "red flags"; 2) whether GSM relied solely on CDL's

10

(4:10 CV 2287)

representations without inquiry when it began soliciting investors; 3) whether GSM continued to make false statements after its "due diligence" trip; and 4) whether GSM turned a blind eye to warning signs of fraud and continued to solicit investors and make false statements.

Plaintiff argues that defendants made false statements without due diligence and in reliance on verbal representations of the Harris brothers and Karen Starr while the danger of misleading customers was so obvious that defendants must have been aware of it.  Plaintiff contends that this conduct is undisputed and establishes scienter as a matter of law.

However, defendants claim that they did not simply rely on the fraudulent representations of CDL representatives, but also relied on seemingly objective evidence, which defendants describe as follows:

    a)     defendants performed a "test investment" prior to marketing CDL's programs;

    b)     wire confirmations and commissions received from CDL; and

    c)     bank statements and computer records at CDL's office in Warren, which were falsified.

Based on this "objective evidence," it appeared to defendants that:

> . . . things were progressing smoothly between CDL and GSM.
> Customers were investing, CDL was sending notice to GSM,
> which billed CDL, which paid GSM the referral commission. . . .

ECF 104, p. 6.

In addition, defendants argue in opposition to plaintiff's motion that "no individual investor ever complained to GSM about not receiving their interest payments from CDL until after the operation was shut down," and "there were no red flags" to alert GSM and Cole.  ECF

11

(4:10 CV 2287)

104, p. 6.  As defendants summed it up in their brief in opposition to plaintiff's renewed motion

for  summary judgment, "[w]hile it is true that GSM could have done a better job performing due

diligence on the background of the Harris brothers and Karen Starr, the fact remains that there

still were no 'red flags' indicating that there were problems to alert GSM and Cole."  ECF 104, p.

6.

UNDISPUTED FACTS

A.      GSM MADE MATERIAL STATEMENTS THAT WERE FALSE AND MISLEADING

The Court has previously identified the three elements that plaintiff must prove to

establish liability for fraud under Sections 4b(a)(2)(A) and (C) of the Act, as amended.  Those

three elements are: 1) the making of a misrepresentation, misleading statement, or a deceptive

omission; 2) materiality; and 3) scienter.  ECF 80.

In its prior opinion denying plaintiff's initial motion for summary judgment, the Court

analyzed the first two elements.  Defendants admit, and the Court has concluded, that it is

undisputed that CDL's forex programs were a fraudulent scheme and that the defendants made

false and misleading material representations to potential investors regarding CDL's programs.

ECF 80.

The Court will not revisit the first two elements that plaintiff must establish to

demonstrate that the Commission is entitled to judgment as a matter of law that defendants are

liable for fraud under Sections 4b(a)(2)(A) and (C) of the Act, and incorporates the analysis and

conclusions from its prior ruling regarding the plaintiff's first two elements of proof.  See ECF

80.  The only remaining issue for consideration in plaintiff's renewed motion for summary

12

(4:10 CV 2287)

judgment is the third element - scienter - and whether plaintiff has established that there is no genuine dispute of material fact that GSM acted with scienter and is liable for fraud under the Act, and that Cole is also liable under the Act as GSM's controlling person.

B.    UNDISPUTED FACTS MATERIAL TO SCIENTER

    1.    GSM's presentations to potential CDL investors

Prior to GSM's first presentation to "friends" on January 18, 2007, GSM, primarily Cole, prepared the power point, informational brochure, and application for CDL's forex investment programs.  These materials were presented and distributed by GSM and Cole at the January 18, 2007 investment seminar, and the Court has previously determined that the information and materials presented contained false and misleading statements.  The false and misleading material statements and information presented by Kevin Hunter and Patrick Cole on January 18, 2007 were also presented by GSM in subsequent presentations marketing CDL's forex programs.

The false and misleading statements and representations made by GSM in marketing CDL's forex programs include, but are not limited to, the following:

    1)    CDL offered professionally managed forex accounts

    2)    investor accounts would be managed by "people who know what they are doing and who just love trading"

    3)    accounts are "traded by professionals who spend years doing all the work"

    4)    CDL has "never lost a client's money" and "they win more than they lose" and has a "conservative trading philosophy"

    5)    at the conclusion of the 3, 6, or 12 month investment term chosen by the investor, "your principal is returned" and "80% of your principal is guaranteed" even "if the sky falls"

13

(4:10 CV 2287)

6)      GSM did its "homework" about CDL's forex investment programs and every precaution taken

7)      CDL investors would receive 7 % interest per month in the 3 month program, 10 % interest per month in the 6 month program, and 12 % interest per month in the 12 month program

8)      "only 3-5% of your dollars is actually in the forex market" and "80% of your money sits in a brokerage account essentially"

GSM and Cole actually had no idea whether the information they presented to potential

CDL investors was true[8] and had not done any "homework" about CDL.[9]  Defendant GSM's

---

[8] The Rule 30(b)(6) deposition of Patrick Cole reflects that GSM based these statements on discussions with CDL's principals without independent verification.  ECF 108, pp. 342-80.

[9] Rule 30(b)(6) deposition of Patrick Cole:
Q:    . . . So when this presentation was done in January of 2007 it was before the due diligence trip in March?
A:    Yes.
Q:    So at this time what homework or due diligence had they at GSM done?
A:    Primarily again through discussions with Kevin Harris.
Q:    And at that point GSM hadn't traveled or had any lengthy discussions with CDL?
A:    Well, we had many discussions with them but we had not traveled to their office as of yet.
Q:    So there were just discussions between you, GSM and CDL and that's what Mr. Hunter is referring to as doing his homework?
A:    I guess so.  Yes.
Q:    And what did he mean by have taken all precautions?
A:    I guess it's the same things.
Q:    So it was just trying to reassure that you've checked out the programs?
A:    I guess so.
Q:    Is there any reason that you would think it's something else?
A:    No.
Q:    And the investment he's referring to, there is the initial investment by the board members in 6K?
A:    Yes.
ECF 108, pp. 356-57.

(4:10 CV 2287)

Rule 30(b)(6) witness, defendant Patrick Cole, testified that the content of GSM's presentations

to investors, and the material developed by GSM for distribution to investors at the presentations,

was based upon discussions with CDL's principals and that GSM had not independently verified

any of the information.  In addition to identifying CDL's representatives as the source of

information that GSM presented regarding CDL's forex programs, Cole testified as follows:

> Q:    In the [January 18, 2007] video, Mr. Cole, you make a statement, "Ladies and
> gentlemen, let me tell you this, one of the things we are committing to do is full
> disclosure."  Did GSM make full disclosure about CDL's investment programs?
>
> A:    The information that we provided about CDL's programs we commuted to
> everyone else.
>
> Q:    But you didn't know if the information you provided at the time you provided it
> was accurate?
>
> A:    We did not independently verify the accuracy, yes.

ECF 108, p. 377.

Even though GSM did not independently verify the information it received from CDL's

representatives, Cole testified in his Rule 30(b)(6) deposition that GSM was comfortable making

these statements without independent verification because GSM was aware of forex programs

offered by other companies that made similar representations:

> Q:    Did GSM feel comfortable about making this guarantee to other customers?
>
> A:    Yes.
>
> Q:    Why?
>
> A:    Because this was the norm in all managed forex programs.
>
> Q:    What do you mean the norm?

(4:10 CV 2287)

A:    At that point in time there were many managed forex programs being offered by quite a few different companies and most of the time offered–stated something very similar to this, that 80 percent was not put into a trading account.

Q:    That's not what this says though.  It says that 80 percent of your amount is guaranteed in case of losses.  It doesn't say anything about not putting it into a trading account, just says if there are losses we'll give you back 80 percent of your funds.

A:    Yes, it says that.

Q:    Which is different than what you said about 80 percent in the bank account.

A:    My comment is based on our discussions with Kevin Harris.

Q:    Did you consider this guarantee to be the same as the 80 percent sitting in the bank account?

A:    Absolutely.

Q:    And even though it's a different form of guarantee?

A:    Yes.

. . . .

Q:    What basis did GSM have to expect that CDL could pay seven to 12 percent monthly interest using only three to five percent of the money?

A:    Again, because most of the programs that were available followed the same pattern and we know of programs that had been running for a while and that the people that we knew that were in them were getting their funds and it was generally the same principal.  Most of the companies that offered managed forex programs at the time followed the same pattern.

Q:    And they all could have been frauds.

A:    They all could have been frauds.

Q:    And GSM did not take any steps to independently verify that only three to five percent of the money was being actually traded?

16

(4:10 CV 2287)

A:    No.

ECF 108, pp. 272-273, 376.

With respect to GSM's false statements to potential investors regarding the experience of

CDL's forex trading team, GSM's Rule 30(b)(6) witness, Patrick Cole, testified as follows:

Q:    Mr. Cole, on the [January 18, 2007] video you state that "The traders involved with Complete Developments are professionals.  They have been doing this for a number of years.  They have the skill sets.  They have the data in order to make the proper analysis and judgment in order to make you money."  What was GSM's basis for this statement?

A:    Information from Kevin Harris and Karen Starr.

Q:    What steps did GSM take to verify this statement was accurate?

A:    None specific.

ECF 108, p. 366.

Neither did GSM verify its statements to potential investors that CDL had a conservative

trading philosophy and disciplined risk management:

Q:    The next bullet is, "Conservative trading philosophy."  What is meant by that?

A:    That Kevin Harris, his trading philosophy was not to be – not to use leverage, for example.  High leverages.  His trading philosophy was more conservative.

. . .

Q:    And you based this on your discussions with Mr. [Kevin] Harris?

A.    Yes.

Q:    And did GSM take any steps to ensure that Mr. Harris was employing a conservative trading philosophy?

A:    Other than discussions with Kevin Hunter, you know, about trading styles and

17

(4:10 CV 2287)

about trading strategies, no, no other specific steps.

Q:      So it was just on discussions, not a review of a track record?

A:      Yes.

Q:      Or a trade history log?

A:      Yes.

. . .

Q:      The last bullet [in the marketing presentation] is, "Disciplined risk management." What do you mean by that?

A:      Tied into the previous point.  He would not be exposing himself to, you know, unnecessary risks and that it would be a more disciplined approach. . . .

Q:      Did CDL have a written risk management program?

A:      Not that I know of.

Q:      What steps, if any, did GSM take to ensure that it was a disciplined risk management program?

A:      Nothing specific.

Q:      Yet GSM felt comfortable presenting the slide which talks about how safe a customer's principal would be?

A:      Yes.

Q:      But at the time GSM hadn't really investigated how safe the principal was beyond talking to Mr. Harris?

A:      No.

ECF 108, pp. 327-30.

(4:10 CV 2287)

It is undisputed that the content of the presentations and materials for the January 2007

and subsequent presentations was prepared by GSM before GSM's due diligence trip to CDL in

March 2007, and was based on "discussions" with Kevin Harris and Karen Starr and not

independently verified for accuracy.  Further, Patrick Cole testified in his Rule 30(b)(6)

deposition that he recognized that CDL's investment programs sounded too good to be true and

that he was aware that some such investment programs may be  fraudulent:

> Q:     But you have no way of knowing whether [CDL's forex program] was really a
> good thing, you relied on whatever Mr. Kevin Harris told you?
>
> A:     Well, a good thing is about the opportunity.  Certainly we relied on information
> that he provided.
>
> Q:     Wasn't the good thing the large, . . . exorbitant interest rates that investors would
> receive, between five to ten percent per month, or 60 to 120 percent a year?
>
> A:     Certainly that's . . .
>
> Q:     And that was the good thing?
>
> A:     But it's the opportunity to do so though that is the issue.
>
> Q:     Right.  But it's not an opportunity that you got every day, it was a unique
> opportunity?
>
> A:     No.
>
> Q:     You were offered other opportunities like this?
>
> A:     Yes.
>
> Q:     And they weren't frauds?
>
> A:     Some were, some of them were not.
>
> Q:     But it had all the hallmarks of being too good to be true?

19

(4:10 CV 2287)

A:      Maybe, yes.

ECF 108, pp. 372-73.

Cole recognized from his own experience that the CDL forex program may have been too good to be true and that other programs promising high return and low risk were sometimes fraudulent.  Nevertheless, GSM pressed ahead making false and misleading statements to potential investors about CDL's forex programs that were based on the unverified representations of Kevin Harris.

2.      CDL's "Diligence Trip" to Warren, Ohio in March 2007

According to Cole's deposition testimony, GSM conducted a "diligence trip" to Warren, Ohio in March 2007.  GSM's due diligence trip occurred after GSM had prepared the materials to market CDL's forex programs, after GSM had begun making presentations to potential investors regarding CDL's forex programs, and after customers began to invest in CDL's programs.[10]  GSM's board members Cole, Kevin Hunter and Dave Reid made the trip to Warren "to get to know [CDL] better, to try and do more–to do due diligence."  ECF 107, p. 153.

GSM board member Kepton McKenzie (McKenzie), a chartered accountant in Canada,

---

[10] GSM's Rule 30(b)(6) witness, Patrick Cole:

Q:      And when you went in March–sometime in February, March, that was more than–you've already made one presentation.  Had you already introduced any customers to the CDL programs?
A:      Well, I guess people had started to invest, yes.
Q:      And people had started to invest because of GSM's presentations?
A:      Yeah, probably.
ECF 107, pp. 145-46.

(4:10 CV 2287)

prepared a 33 item due diligence checklist.[11]  Although McKenzie prepared the list of due

diligence items to be covered by GSM during the Warren, Ohio trip, McKenzie recognized in

advance that all of the items could not be addressed in the planned one day trip, which took place

on a Saturday,[12] and Patrick Cole testified that "[w]hen we got there it was a Saturday, so we

were not able to do some of the things that I guess we would have wanted to do."  ECF 107, p.

138.

   Thirteen due diligence items in section "A" focused on "Background Check" of the

principal of CDL, and are as follows:

1.  Character references
2.  Police record
3.  Details on nature of past encounter(s) with the police and jail term
4.  Result of court cases
5.  Reason for closure of CDL/Instant Money Tree in other State(s) to determine if he starts them and then close [sic] them
6.  Reason for early retirement from Engineering/Building construction
7.  Look at Engineering certification
8.  Look at personal tax returns
9.  Visit home and meet with family, if possible
10. Determine if he was born and raised in Ohio.  If no, which State?
11. Look at Birth certificate, passport, drivers license
12. Former employers and name of contact
13. Guys, if he is not already there can we guide him to faith in Christ. Wow!!

Twenty due diligence items in Section "B" focused on "Business Matters" as follows:

1.  Agreement between CDL and GSM to be finalized and ready for filing
2.  Look [sic] bank statements and establish current bank balances
3.  Look at brokerage account

---

[11] The complete list of items as prepared by GSM is filed on the docket at ECF 98-6.

[12] "For a one day trip it is not possible to do them all.  Somethings [sic] we might not even be able to do at all but I state them anyway."  ECF 98-6.

(4:10 CV 2287)

4.     Determine if the 80% rule is being observed consistently
5.     Observe how FX trades are conducted
6.     Meet with Bank Manager
7.     Meet with current local program participant(s)
8.     Physical inspection of real property owned by CDL or its Principal
9.     Walk-through of office procedures
10.    Evidence that the current Plaintiff has been receiving money
11.    Meet with accountant and look at books.  Determine if participants [sic] money are [sic] accounted for as loan to the organization
12.    Determine if accounting records are up-to-date and audited
13.    Determine if CDL currently has off-shore accounts
14.    Look at trading records to see the level of profits made on FX transactions
15.    Determine if CDL's own cash are [sic] co-mingled with participants [sic] funds
16.    Confirm that all principal will be returned at the end of cycle unless participant gives written instructions to rollover same
17.    Confirm that interest payments are never considered as a partial return of principal
18.    Determine that interest payments are forwarded to the bank in a timely manner
19.    Determine the value of the book of business that CDL and it predecessor company have been doing over the years
20.    Talk with lawyer(s)

ECF 98-6.

Prior to GSM's March 2007 trip, GSM had not conducted any background checks on CDL's principals.  During the March 2007 trip, GSM's background check of CDL's principal consisted of asking Kevin Harris about his police record.  Kevin Harris told them his police record was based on "fights and run-ins he had with individuals . . . that had to do with racism."

In fact, Kevin Harris had pled guilty to obtaining property under false pretenses and did time for felony arson and theft.  When asked if the actual facts of Kevin Harris' criminal past would have affected GSM's decision to do business with CDL, Patrick Cole testified: "Absolutely."  ECF 107, p. 175-76.  However, GSM did nothing to independently  investigate

22

(4:10 CV 2287)

Kevin Harris' police record, including looking on-line for newspaper articles[13] or contacting

authorities in Ohio.  ECF 107, p. 174 (Q: . . . and you did nothing to actually independently

investigate [Kevin Harris'] police record?  A: No.).

GSM did not even ask Kevin Harris about Keelan Harris' or Karen Starr's police record.

Keelan Harris had been convicted for identity theft and conspiracy to commit credit card fraud,

among other crimes.  Karen Starr had been convicted of fraud and bigamy.  When asked if

Keelan Harris' and Karen Starr's criminal background would have made a difference in GSM's

decision to do business with CDL, Patrick Cole testified: "Absolutely."  ECF 107, p. 175-76.

However, as with Kevin Harris' police record, GSM did nothing to independently investigate

Keelan Harris' or Karen Starr's background.

Other items on GSM's due diligence checklist were also checked off by GSM through

"discussions" with CDL principals but not independently confirmed, such as # B17 (confirm that

interest payments never considered as a partial return of principal).  With respect to # B7, "meet

with local program participants," GSM met with one participant, a football player, during the due

diligence trip, but did not request a list of participants from CDL, contact CDL customers to

discuss their investment experience, or contact any 6K[14] investors.  ECF 107, p. 196-97.

---

[13] Cole had a degree in computer science and his deposition testimony reflects that he
understood the value of the internet as a source of information:
Q:      Did you ever do a Google search on your own name?
A:      Yes.  And it's not good.
ECF 107, p. 168.

[14] 6K, an entity different from CDL, was the entity that Cole invested in as a "test"
investment.

(4:10 CV 2287)

With respect to the due diligence item # B4, "determine if the 80% rule is being observed consistently," Cole testified that during the due diligence trip to Warren, he was shown a computer screen displaying "a bank balance at a moment in time."  According to Cole, the purported bank balance displayed to GSM during the due diligence trip was what GSM "expected to see," and GSM did not independently confirm that what was displayed on the computer screen was actually a CDL bank balance or that any such balance was consistently maintained.[15]  ECF 107, pp. 194-95.  The due diligence trip to Warren was the first time that GSM had observed any bank balances, and was after GSM had begun soliciting investors for CDL's investment programs and after investors had started to invest.  ECF 107, p. 194.  On a related matter, GSM did not independently verify that only 20% of investors' funds were at risk of loss and had no procedure in place to make that verification.  ECF 107, p. 195.

During their due diligence trip to Warren, Ohio, there were many items on the due diligence checklist that Patrick Cole, Kevin Hunter and Dave Reid from GSM did not address at all, including: # A8 (look at personal tax returns), # A9 (visit home and meet with family), # A11 (look at birth certificate, passport, drivers license), # B2 (look at bank statements and establish

---

[15] GSM's Rule 30(b)(6) deposition of Patrick Cole:
Q:      Did you ever ask CDL to give you a week's worth of balances?
A:      No.
Q:      Did you ever ask them to give you a month's worth of balances?
A:      No.
Q:      So your only discussion was for individual days?
A:      Yes.
ECF 108, p. 353.

(4:10 CV 2287)

current balances), # B6 (meet with bank manager),[16] # B11 (meet with accountant and look at books and determine if participants' money is accounted for as a loan to CDL), # B12 (determine if accounting records are up-to-date and audited), # B13 (determine if CDL currently has off-shore accounts), # B15 (determine if CDL's own cash is co-mingled with participant funds), # B16 (confirm that all principal will be returned at the end of the investment cycle),[17] and # B19 (determine the value of CDL's book of business). ECF 107, pp. 163-66, 195-200.

Although the due diligence items were identified by GSM itself as topics to be investigated, GSM and Cole recognized in advance that one day was insufficient to complete the list and that some of the items could not be completed because the trip was scheduled for a Saturday. Additional time was not scheduled for the due diligence trip or arrangements made for the trip to occur during the normal business work week in order to address all of the items on GSM's due diligence checklist.

In summary, it is undisputed that neither Cole nor GSM independently verified the information they received from Kevin Harris and CDL or looked beyond the surface of CDL.[18]

---

[16] In addition to never meeting with CDL's bank manager, GSM did not call the bank manager or ask for written confirmation of balances. ECF 107, p. 196.

[17] Patrick Cole testified that this point was not completed in Warren, Ohio on that Saturday, however, it was later established by wire confirmations of investor funds. GSM received wire confirmations when investors sent money to CDL or rolled over principal at the end of an investment cycle. ECF 107, pp. 203-04.

[18] Q:   And then it goes on to say, "On the surface there, I saw no irregularity that would be a red flag something was amiss," because you didn't look beyond the surface?
   A:   Yes.
ECF 110, pp. 65-66.

25

(4:10 CV 2287)

It is also undisputed that GSM and Cole did not arrange for adequate and appropriate time to complete their due diligence checklist even though they recognized in advance that a one-day Saturday trip was insufficient, and at least 10 of GSM's 33 due diligence items were never addressed.  The due diligence items that GSM considered completed were based upon the representations by CDL representatives without independent verification.  Even though it is undisputed that GSM did not complete its due diligence of CDL, GSM continued presenting unverified, false and material statements to potential investors about CDL's forex programs based upon the representations of Kevin Harris as those presentations were originally prepared by Patrick Cole.

        3.    <u>Investor suspicions and "audit" of CDL</u>

After GSM's marketing of CDL's forex programs began, Cole testified in his Rule 30(b)(6) deposition that GSM received comments from potential investors questioning whether CDL's forex programs were a scam:[19]

Q:      Did GSM receive comments from prospective customers questioning whether CDL and its programs were fraudulent?

A:      I don't think if–yes, we probably did.  Yeah.

Q:      And that didn't raise any concerns with you?

---

[19] In the summer of 2007, Cole also became aware of a radio call-in program during which a GSM presentation regarding CDL was discussed on the air and the radio host told a caller "it must be a scam."  Cole testified that information about the radio call-in program was relayed to him by GSM board member, Kevin Hunter.  However, Cole testified that negative public comments about CDL's forex programs did not raise any concern with GSM and GSM did not contact CDL to ask why its programs might be considered a scam.  ECF 110, p. 44-45.

26

(4:10 CV 2287)

> A:      Not necessarily.

> Q:      And being questioned by customers that–who were wondering whether the programs were a scam, GSM did not increase their due diligence or attempt to independently verify more information?

> A:      We did not.

> ECF 108, pp. 384-85.

It is undisputed that in February 2007, Cole sent an e-mail to CDL principal Kevin Harris stating that "the biggest issue we face is convincing individuals that CDL and the programs are not a scam."  In response to these concerns, GSM did not increase its due diligence, but developed a "strategy that will eliminate the scam concern" and attract wealthy investors. GSM's strategy involved engaging a well-known accounting firm to perform an audit of CDL and issue a report.  ECF 108, p. 386-87.  According to Patrick Cole, the audit would also serve to "verify what they [CDL] were saying."[20]

---

[20] Patrick Cole deposition:
Q:      The next statement says "We also asked for an audit of CDL operations by a third party to establish credibility."  Was the audit only to establish credibility?
A:      No, it's supposed to also verify what they were saying.  All the things that we had asked them about that as in my draft letter.  It was supposed to establish all of those things as well.
Q:      So to establish the facts and make the company look more credible.
A:      Well to establish the facts the company would be credible.
Q:      Or is credible?
A:      Or is credible.
ECF 110, p. 26.

(4:10 CV 2287)

Cole himself told potential investors about the large sums of money that CDL made in forex trading even without participants' money.[21]  Yet, Cole testified at his Rule 30(b)(6) deposition that Kevin Harris declined to retain a well-known accounting firm because "the cost of getting a national company like that would have been high and he didn't want to expend that–spend that money so he would get a local CPA to do it."  ECF 108, p. 391.

CDL retained Paul Hawkins to perform this audit, who CDL claimed was a qualified local accountant.  GSM and Cole provided Harris with a letter containing specific objectives for the audit "because Kevin [Harris] was not very familiar with a process like that . . . [a]nd so I wrote the letter to say to him, Kevin, this is something like what we would expect to see after an audit."  ECF 108, p. 395.

In April 2007, after GSM began soliciting customers to invest in CDL's forex programs, Paul Hawkins issued a letter purporting to set forth the results of a validation and audit of CDL that Hawkins claimed to have personally conducted, and a copy of his accounting license.  ECF 98-8.  Hawkins' audit letter is replete with false statements, including the specific conclusion that "CDL's operation is not a 'Ponzi scheme.'"  This particular conclusion was requested by GSM, who was looking for an opinion that CDL was not a Ponzi scheme after the audit was performed "if it was truthful."  ECF 108, pp. 393-96.

---

[21] "They [CDL] make so much money just participating in the forex market.  They make money doing what they do.  They make far more money than the participants could give them."  ECF 108, p. 378.

(4:10 CV 2287)

One of GSM's principals was a chartered accountant in Canada.  However, GSM did not investigate Mr. Hawkins' qualifications or make any inquiry regarding the scope of his audit, documents reviewed, or work papers on which he based his audit conclusions.  ECF 108, pp. 391-92, 400-10.

Cole testified at his deposition that GSM distributed Hawkins' audit letter at one presentation to 25-30 potential CDL investors.  After distributing Hawkins' report, it was brought to GSM's attention that Hawkins' CPA license had lapsed.[22]  According to Cole's testimony, GSM did not take steps to contact the individuals to whom the report had been distributed or advise them that Hawkins was not qualified to issue the audit letter.  ECF 108, p. 411.

When GSM learned that Hawkins was not a qualified CPA, GSM "understood" that Hawkins would be taking steps to renew his license.  However, GSM was not aware that Hawkins' license was ever renewed, and GSM never asked CDL to hire another accountant to perform the audit.  ECF 107, pp. 229-30.

---

[22] Patrick Cole Rule 30(b)(6) deposition:
Q:      And how did you find out that his license was lapsed.
A:      I believe – I believe someone asked us about it or mentioned it to us.
. . .
Q:      And you didn't check with the Ohio State Board of Accountancy before –
A:      No.
ECF 107, pp. 68-69.

(4:10 CV 2287)

>        4.      Allegations and complaints by investors against CDL

In early February 2007, Marilyn Poole filed a lawsuit in the Trumbull County Court of Common Pleas against Kevin Harris, CDL, and others, alleging that she invested $15,000 of life insurance proceeds from her deceased husband in CDL, and that Harris and CDL did not return her investment and engaged in a "fraudulent scheme" to deprive her of her funds.  Poole's lawsuit was a public record and reported in the local newspaper, the Youngstown *Vindicator*.

GSM and Cole "found out" about Marilyn Poole's pending lawsuit against CDL and Harris alleging fraud and failure to return investment funds.  Poole's lawsuit was pending the entire time that GSM was soliciting customers for CDL's forex programs and representing to potential investors that CDL never failed to return investors' principal.

After learning about Poole's lawsuit, GSM asked Kevin Harris about it and Harris showed Cole checks made out to Poole that "covered her account."  ECF 107, p. 177.  However, Cole did not know whether Harris actually provided those checks to Poole, and GSM did not contact Poole or access the court's records to independently assess the status of Poole's lawsuit against CDL and Harris.  ECF 107, pp. 177-79.

In addition to learning about Marilyn Poole's lawsuit alleging fraud against Kevin Harris and CDL, GSM itself, over a 12-18 month period, received complaints from "individuals who would tell us they had some issues" regarding CDL's processing of applications and interest payments.  ECF 108, pp. 245-46; ECF 110, pp. 32-33 ("We [GSM] worked with many, many, members answering their questions and concerns about payment and communication problems" all through 2007 and into 2008).  Those complaints occurred even towards the beginning of

30

(4:10 CV 2287)

GSM's marketing of CDL's forex programs.   ECF 108, pp. 245-46.

APPLICABLE LAW

A.    SUMMARY JUDGMENT STANDARD

There is no dispute among the parties regarding the summary judgment standard.  The Court shall grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The party asserting that a fact cannot be genuinely disputed must support that assertion with materials from the record, including depositions, documents, stipulations, affidavits or declarations, etc. Fed.R.Civ.P. 56(c)(1)(A) & (B).  Once the moving party has done so, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  A court considering a motion for summary judgment must view all of the asserted facts and inferences in the light most favorable to the non-moving party.  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, conclusory statements do not create a specific fact dispute for summary judgment purposes.  *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888-89 (1990).

Whether summary judgment is appropriate depends on whether there is a genuine dispute as to a material fact, or if the evidence is so one-sided that the moving party prevails as a matter of law.  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989).  Summary

31

(4:10 CV 2287)

judgment is appropriate when there is but one reasonable conclusion. *Anderson*, 477 U.S. at

250-51; *Matsushita,* 475 U.S. at 587 (1986)(when the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, then there is no genuine issue for

trial)(citations omitted); *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386,

390 (6th Cir. 2003)(central issue is whether evidence presents sufficient disagreement to require

a jury, or whether evidence is so one-sided that one party must prevail as a matter of

law)(quoting *Anderson,* 477 U.S. at 251-52); *Street,* 886 F.2d at 1478.

B.      SECTIONS 4b(a)(2)(A) AND (C) OF THE ACT , 7 U.S.C. § 6b(a)(2)

        Sections (A) and (C) of Section 4b(a)(2) of the Act make it unlawful to cheat, defraud,

deceive, or attempt to cheat, defraud, deceive, any person, in connection with foreign currency

contracts.  Plaintiff alleges that GSM's misrepresentations and omissions of material facts

relative to CDL and its forex programs violated Sections 4b(a)(2)(A) and (C) of the Act. [23]

        To establish liability for fraud by misrepresentation, three elements must be established:

1) the making of a misrepresentation, misleading statement, or deceptive omission; 2) the

materiality of such statement or omission; and 3) scienter. *R.J. Fitzgerald & Co.,* 310 F.3d at

1328; *Carnegie Trading Group,* 450 F. Supp.2d at 798 (to establish a claim for fraud under

section 4b(a) of the Act, the Commission must demonstrate defendant made a material

---

[23] In this case, the criteria of Section 2(c)2(C) of the Act, 7 U.S.C. § 2(c)2(C), as amended
by the Food, Conservation Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the
CFTC Reauthorization Act of 2008 (the CRA)), §§ 13101-13204, 122 Stat. 1651, are
satisfied and the plaintiff has jurisdiction to pursue this forex fraud case. *See also* H.R.
Rep. No. 2419, at 978 (2008) (Conf. Rep.).

(4:10 CV 2287)

misrepresentation or omission of fact with scienter); *see also SEC v. George*, 426 F.3d 786, 792

(6th Cir. 2005) (applying same elements for establishing fraud under similar civil anti-fraud

provisions of the federal securities laws).[24]

      The scienter element may be satisfied by showing that the defendant made the false and

misleading material representation intentionally or with reckless disregard of the truth. *Carnegie*

*Trading Group*., 450 F.Supp.2d at 801; *see George,* 426 F.3d at 792.  Recklessness is an

"extreme departure from the standards of ordinary care" or "highly unreasonable" that present a

danger of misleading the customer which is either known to the defendant or so obvious that the

defendant must have been aware of it. *R.J. Fitzgerald*, 310 F.3d at 1328 (citing *Messer v. E.F.*

*Hutton,* 847 F.2d 673, 677-79 (11th Cir. 1988) and *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194,

1202 (11th Cir. 2001)); *George*, 426 F.3d at 792 (6th Cir. 2005) ("highly unreasonable conduct

which is an extreme departure from the standards of ordinary care")(quoting *Mansbach v.*

*Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)).  In order to establish scienter, the

CFTC is not required to show evil motive or intent to injure. *CFTC v. Vandeveld*, 2007 WL

2823307 at *5 (W.D. Tenn. Sept. 27, 2007).

      Various types of conduct have been found by the courts to be reckless under the anti-

fraud provisions the Act or the similar anti-fraud provisions of the federal securities laws.  Such

conduct includes promoting investment programs without verifying the legitimacy of the

---

[24] Cases concerning the similar anti-fraud and equitable relief provisions of the federal
securities laws have been cited by courts considering cases brought by the CFTC as
instructive in considering anti-fraud commodities cases. *See e.g. CFTC v. Hunter Wise*
*Commodities*, 2013 WL 718503, Comm.Fut.L.Rep. P32,552, S.D.Fla., Feb. 26, 2013.

(4:10 CV 2287)

programs. *George*, 426 F.3d at 788, 795 (virtually risk-free investment with lucrative returns have all the "hallmarks of a free lunch" and defendant acted recklessly when failed to verify legitimacy of investment programs he advertised)(citing *SEC v. Jakubowski*, 150 F.3d 675, 682 (7th Cir. 1998) (deliberate ignorance is a form of knowledge); *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d, 398, 415 (S.D.N.Y. 1998)(reckless disregard of truth satisfies scienter when defendant deliberately fails to acquire the information that would have revealed that defendant's statements were false or misleading)); *Vandeveld*, 2007 WL 2823307 at *6 (failure to investigate FxTrade and to verify information in FxTrade brochures before soliciting investors satisfies scienter).

Relying without thorough investigation on information provided by corporate representatives is also reckless conduct sufficient to establish scienter. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985); *SEC v. Hedgelender LLC,* 786 F.Supp.2d 1365, 1370-71 (S.D. Ohio 2011) (defendants acted at least recklessly by making representations to potential investors that they had conducted due diligence and regarding the validity of the investment program when defendants knew due diligence had not been conducted )(citing *Blavin*, 760 F.2d at 711); *SEC v. Gagnon*, 2012 WL 994892 at *3-4, 10 (E.D. Mich. March 22, 2012)(defendant represented to investors that he had conducted thorough research but actually conducted no due diligence before offering programs to investors but simply relied on fraudster's representations "at face value" without making any independent investigation, including fraudster's background, which would have revealed he had been previously convicted of fraud).

34

(4:10 CV 2287)

A defendant's own losses in a fraudulent investment program do not automatically negate scienter.  *George*, 426 F.3d at 793 (defendant's contention that he truly believed fraudster and that defendant himself lost money does not controvert the evidence that defendant encouraged people to invest in a program about which he knew nothing).  Neither does a defendant's good faith belief in his material false representations.  *SEC v. Infinity Group Company*, 212 F.3d 180, 193 (3d Cir. 2000) ("A good faith belief is not a 'get out of jail free card' . . . [and] will not insulate the defendants from liability for [civil securities fraud] if it is the result of reckless conduct.").  A subjective belief based on a reckless inquiry cannot be considered a "good faith" belief, and ignorance does not negate recklessness "where a reasonable investigation would have revealed the truth."  *Infinity Group,* 212 F.3d at 193.

The first two elements of proof with respect to defendants' alleged violation of Sections (A) and (C) of Section 4b(a)(2) have been established by plaintiff and the Court has already concluded that there is no genuine issue of fact that defendants' representations to potential investors regarding CDL and CDL's forex programs were material, false and misleading.  The only remaining issue is the third element - scienter.  There is no dispute among the parties regarding the legal standard for proving scienter.  The parties' disagreement centers around whether the undisputed facts support a conclusion that defendants' conduct was reckless as a matter of law.

35

(4:10 CV 2287)

C.     SECTION 13(b) OF THE ACT, 7 U.S.C. § 13c(b)

Plaintiff alleges that as the controlling person of GSM, Cole is liable for GSM's

violations of the Act pursuant to Section 13(b).  Section 13(b) of the Act provides:

> Any person, who, directly or indirectly, controls any person who has violated any
> provision of this Act . . . may be held liable for such violations in any action brought by
> the Commission to the same extent as such controlled person.  In such action, the
> Commission has the burden of proving that the controlling person did not act in good
> faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

To establish controlling person liability under the Act, the Commission must demonstrate

that Cole controlled GSM for purposes of the Act, and did not act in good faith or knowingly

induced GSM's violations of the Act.

In order to satisfy the element of "control" for purposes of the Act, the defendant must

exercise general control over the operation of the entity principally liable for violations of the

Act, and possess the power or ability to control the transaction or activity upon which the primary

violation is based. *Carnegie Trading Group*, 450 F.Supp.2d at 802 (quoting *CFTC v. Baragosh*,

278 F.3d 319, 333 (4th Cir. 2002)).  To establish knowing inducement, the Commission must

show that the controlling person had actual or constructive knowledge of the core activities that

constitute the primary violation and allowed them to continue.  *JCC, Inc. v. CFTC*, 63 F.3d 1557,

1569 (11th Cir., 1995).  Controlling persons cannot avoid liability by consciously avoiding actual

knowledge of wrongdoing.  *JCC*, 63 F.3d at 1568-69.  Constructive knowledge of wrongdoing is

a sufficient basis for a finding of knowing inducement.  A defendant has constructive knowledge

if he consciously avoids actual knowledge.  *JCC*, 63 F.3d at 1569.

36

(4:10 CV 2287)

ANALYSIS

A.    GSM'S REPRESENTATIONS TO POTENTIAL CDL INVESTORS WERE AT LEAST RECKLESS

1.    Material false statements regarding CDL's forex programs

It is undisputed that GSM's presentations and information marketing CDL's forex

investment programs were filled with material and false statements, ranging from low risk of loss

and a guaranteed return of principal, to high rates of return, to the experience of CDL's forex

trading team.  The record is replete with testimony by GSM's Rule 30(b)(6) witness, Patrick

Cole, that he prepared the power-point, informational brochures, and the content of GSM's

presentations promoting  CDL's forex investment programs based on information that Cole

received from Kevin Harris and other CDL principals, and that GSM did not independently

verify that information for accuracy.

GSM also relied entirely on Harris' representations regarding his background and

criminal history.  Publicly available information would have revealed that Kevin Harris and

CDL's principals had criminal histories of fraud and dishonesty.

GSM's Rule 30(b)(6) witness, Patrick Cole, testified that CDL's programs were almost

too good to be true.  Further, in Cole's own past experience, such "opportunities" sometimes

proved to be fraudulent.  However, notwithstanding that CDL's programs had all the hallmarks

of a free lunch, and that Cole was himself aware that such free lunches were sometimes

fraudulent, GSM forged ahead based on information from CDL's principals without independent

verification.  By the time GSM made any attempt to conduct due diligence, investors had already

37

(4:10 CV 2287)

begun to invest as a consequence of GSM's presentations.

The information provided by GSM to potential investors regarding the risk, interest rate, guaranteed principal, and security of CDL's forex programs was based on discussions with CDL's principals, Kevin Harris and Karen Starr, without independent verification of the accuracy of that information.   Such conduct is at least reckless and sufficient to establish scienter. *See SEC v. HedgeLender,* 786 F.Supp.2d at 1370-71 (citing *Blavin,* 760 F.2d at 711).

Based on the undisputed material facts in the record, the Court concludes that there is no genuine dispute that GSM was at least reckless when it made false representations to potential investors without independent verification of the accuracy of information provided by CDL's corporate representatives regarding CDL's forex programs.

> 2.    Material false statements regarding GSM's own conduct

In addition to making unverified, false and misleading representations to potential investors regarding CDL's investment programs, GSM made false and misleading statements to potential investors regarding GSM's own conduct.  GSM told potential investors that it had done its "homework" and taken "all precautions" regarding CDL.  In fact, the testimony of GSM's Rule 30(b)(6) witness, Patrick Cole, establishes that GSM's homework consisted of discussions with CDL's principals and reliance on their representations, and was not independently verified by GSM.

Further, GSM did not reveal to potential investors the extraordinary preferential interest rates that GSM and its principals received from CDL that resulted in essentially a doubling of

38

(4:10 CV 2287)

their investments in only 6 months.  GSM also did not reveal to potential investors that GSM's

sole source of income was commissions received from CDL, or that the commissions were based

on the amount of money invested by customers in CDL's forex programs, or that CDL paid GSM

increased commissions for dollars invested in CDL as a result of referrals from GSM.[25]

     In addition, GSM represented to potential investors that GSM was committed to

operating with transparency and integrity.  GSM made this representation despite the fact that

GSM had actually not done its "homework" or taken "all precautions" regarding CDL's forex

programs while representing to customers that it had done so, and did not reveal the extent of the

financial interest that both GSM and its principals had in persuading investors to invest in CDL's

forex programs.

     By representing to potential investors that they had done their "homework" and taken "all

precautions" without conducting any due diligence or independently verifying the accuracy of its

representations to potential investors, GSM's conduct was at least reckless.  *See Hedgelender*,

786 F.Supp.2d at 1370-71; *Gagnon*, 2012 WL 994892 at *10 (defendant represented to investors

---

[25] Patrick Cole Deposition:

Q:    And your first bullet point says, "Our objective was to make CDL very successful because your success would be our success."  What did you mean by that.

A:    . . . So because we were working on commission, if they were successful then, you know, we would be compensated.

Q:    So if CDL was not successful in getting money into the programs GSM wouldn't make any money?

A:    No.

Q:    And there was a direct relationship to – between how much GSM made and how much was invested in the programs?

A:    Yes.

ECF 110, pp. 20-21.

(4:10 CV 2287)

that he had conducted thorough research but had performed no due diligence).

The self-interested false and misleading statements that GSM made about its integrity and due diligence regarding CDL were material to the credibility of GSM's presentations to potential investors.  It is undisputed that GSM made these false and misleading statements with the knowledge that the statements were not true, and were made for the purpose of persuading attendees to invest in CDL's forex programs.

Based on these undisputed material facts, the Court concludes that there is no genuine dispute that GSM was at least reckless when it made false and misleading statements to potential investors about GSM's own efforts vetting CDL's investment programs.

B.    GSM'S FAILED DUE DILIGENCE OF CDL WAS AT LEAST RECKLESS

Patrick Cole testified in his Rule 30(b)(6) deposition that GSM's due diligence trip to CDL in Warren, Ohio took place after GSM had begun soliciting customers to invest in CDL's forex programs and investors had started to invest.  GSM's 33 item due diligence checklist was developed by one of GSM's principals, who is a chartered accountant in Canada.  GSM scheduled its due diligence trip for one day, on a Saturday.  Prior to the trip, GSM recognized that one day on a weekend would not be sufficient to complete GSM's due diligence.

GSM checked off some of the items on its due diligence checklist solely based on information provided by Kevin Harris.  One of those items was the criminal history of CDL's principals.  GSM made no investigation of CDL's principals prior to soliciting investors for CDL's forex programs.  On that Saturday, GSM accepted what Harris said about his record

40

(4:10 CV 2287)

without independently verifying Kevin Harris' story, and made no inquiry regarding the criminal

history of Keelan Harris or Karen Starr.

According to GSM's Rule 30(b)(6) witness, Patrick Cole, whether CDL's principals had

police records was an important due diligence factor, and had GSM known the truth about the

criminal history of the Harris brothers and Starr, they would not have entered a business

relationship with them.  But despite the importance of this information, it is undisputed that

GSM did not conduct any independent investigation – not even an internet search or review of

publicly available records – which would have revealed that the Harris brothers and Starr had

criminal records involving fraud and dishonesty.

Other items on GSM's due diligence checklist related directly to CDL's forex programs,

including brokerage accounts, 80% principal guarantee "being observed consistently," forex

trading, comingling of CDL and investor funds, and timely interest payments.  GSM had

previously conducted no due diligence regarding these items even though GSM had already

begun making representations to investors regarding CDL's forex programs and investor money

was already flowing to CDL.  Like the information that GSM received regarding the criminal

history of CDL's principals, GSM did not independently verify any of the information regarding

the particulars of CDL's forex programs, but accepted what they were told and shown by Kevin

Harris even when the information Harris provided was insufficient on its face.

(4:10 CV 2287)

For example, consider GSM's due diligence item regarding the "consistent" observance of "the 80% rule."  On that Saturday, GSM was shown a computer screen which displayed a bank balance for a single day reflecting what GSM "expected to see" regarding 80% of investor funds.  Even if that bank balance was a true balance for that single day, it provided no answer to GSM's due diligence question whether the 80% rule was being "observed consistently."  It is undisputed that GSM did not verify that the bank record displayed was even real by independently contacting the bank for verification, and GSM did not to ask for bank records for a period of time that would have been necessary to determine whether the 80% rule was "consistently" observed by CDL.

Some items on GSM's due diligence checklist were not completed at all because of the limited time and day of the week that GSM scheduled for its due diligence of CDL.  About one-third of the items on GSM's due diligence checklist were not addressed.  Some of the items never addressed included questions regarding CDL's business practices, such as meeting with CDL's bank manager and accountant and determining whether CDL's books were up-to-date and audited.  GSM specifically included these items on its checklist, and the importance of these due diligence items is obvious.  However, GSM's scheduled time to perform due diligence on CDL was inadequate to address these items.  It is undisputed that GSM did not schedule additional due diligence time or address these items by other means, such as making contact with the bank manager and accountant and obtaining documentation by phone, fax, or e-mail.

42

(4:10 CV 2287)

GSM prepared a list of due diligence items that, if performed, would have revealed that CDL's forex programs were a fraud.  Patrick Cole testified at deposition that he and GSM's principals believed what they were told by Harris and Starr, and that GSM's principals were honest people and expected that others would be honest in return.

Assuming for the purpose of summary judgment analysis that this is true, GSM's and Cole's good faith belief in the information provided to them by Kevin Harris and Starr does not automatically create a material fact dispute as to recklessness.  *See Infinity Group,* 212 F.3d at 193.  GSM was in the business of persuading investors to send money to CDL for a high-return low-risk investment opportunity that Cole recognized from his own prior experience may have been too good to be true and a fraud.  By successfully persuading customers to invest in CDL, GSM and its principals realized a significant monetary benefit.  GSM's claimed good faith belief in the honesty of CDL's principals and ignorance that CDL was a fraud does not create a material dispute of fact regarding scienter when there is no dispute that GSM utterly failed to make an independent investigation and perform due diligence which would have readily revealed that GSM's statements to potential investors regarding CDL's forex programs were false.

Based in the undisputed record, there is no genuine dispute that GSM's failure to independently investigate CDL and to perform its own due diligence checklist before making false and material representations to potential investors was at least reckless.  *See George,* 426 F.3d at 795.

43

(4:10 CV 2287)

C.      GSM RECKLESSLY IGNORED INVESTOR SUSPICIONS, COMPLAINTS AND ALLEGATIONS

It is undisputed that GSM was aware of Marilyn Poole's lawsuit alleging that CDL was a fraud and that her principal had not been returned.  Patrick Cole also testified in deposition that GSM knew that investors which GSM had referred to CDL had complaints regarding payments from CDL, processing applications, and communications because these investors complained to GSM.  According to Cole, these complaints occurred throughout GSM's marketing of CDL's forex programs, including at the beginning of the marketing campaign.  In addition, some potential investors asked GSM directly if CDL's forex programs were a scam.

However, it is undisputed that the suspicions of potential investors, actual investor complaints concerning payments from CDL, and an investor lawsuit against CDL for fraud, did not deter GSM from continuing to make false and material statements to potential investors while marketing CDL's forex programs, or cause GSM to question the representations of Kevin Harris that GSM had previously simply accepted, or move GSM to look below the surface of CDL's operations and make an independent objective assessment of the suspicions, complaints and allegations.

In the face of these suspicions, complaints, and allegations, there is no genuine dispute that GSM acted at least recklessly in carrying on with their material and false representations regarding CDL's forex programs, and in failing to acquire the information by independent investigation that would have revealed that GSM's statements to potential investors regarding CDL's programs were false and misleading.  *See George*, 426 F.3d at 795.

44

(4:10 CV 2287)

D.    GSM AT LEAST RECKLESS IN RESPONSE TO "AUDIT" OF CDL

It is undisputed that the idea for an audit of CDL by a well-known accounting firm originated with GSM.  According to Patrick Cole, GSM sought an audit for two reasons: to establish that CDL was not a scam or a Ponzi scheme in order to attract wealthy investors, and to establish the credibility of GSM's claims regarding CDL's forex programs.  However, despite Harris' statements and GSM's claimed belief that Harris was a wildly successful forex trader, Harris declined to retain a well-know accounting firm to audit CDL because it would be too expensive.  Instead, CDL told GSM it had retained a local CPA.

According to Cole's affidavit, GSM "confronted Kevin Harris with the fact that Paul Hawkins' audit was not what we wanted or what CDL needed to demonstrate credibility."  ECF 104, Page ID 1876.  Nevertheless, there is no fact dispute that GSM not only acquiesced to an audit by Paul Hawkins, but did nothing to investigate Hawkins' credentials or familiarity with issuing an audit letter even though GSM had in-house expertise because one of its principals was a chartered accountant in Canada.  Although Hawkins' qualifications were entirely unknown to GSM, it is undisputed that GSM accepted the audit without inquiring into the nature of the documentation and the specific parameters of Hawkins' audit and did nothing to confirm that the audit GSM had requested was properly performed.  ECF 108, pp. 401-411.

There is no dispute that Cole recognized that an audit letter by a local CPA was inadequate for their purpose of establishing CDL's credibility.  Nevertheless, upon receiving Hawkins' audit letter, which included the conclusion that CDL was not a Ponzi scheme, GSM

45

(4:10 CV 2287)

distributed the letter to potential investors at a marketing presentation attended by 25-30 people. Along with Hawkins' letter, GSM distributed a copy of Hawkins' CPA license.  When GSM discovered that Hawkins was not qualified to issue his opinion letter regarding CDL, it is undisputed that GSM did nothing to recall the letter from potential investors who had received it or to inform those investors that they could not rely on Hawkins' conclusions regarding CDL.

Based on the undisputed record, the Court concludes that GSM was at least reckless by failing to inform the individuals to whom they had distributed Hawkins' audit letter that the letter was not valid and the danger of misleading potential investors by not recalling the letter was so obvious that GSM must have been aware of it.  *R.J. Fitzgerald*, 310 F.3d at 1328.

GSM was told by CDL that Hawkins was taking steps to restore his license.  GSM recognized the importance of an audit letter to establish the credibility of CDL's forex programs. However, it is undisputed that to GSM's knowledge Hawkins' license was never renewed, and GSM did not request another audit of CDL by a qualified accountant.

Based on the undisputed record, the Court concludes that GSM's failure to obtain another audit in the face of the Hawkins' failed audit was at least reckless when GSM itself recognized that the acquisition of such information would have revealed whether or not CDL was a legitimate operation.  *See George*, 426 F.3d at 795 (deliberate failure to acquire information that would have revealed that defendant's statements were false is reckless; deliberate ignorance is a form of knowledge).

46

(4:10 CV 2287)

E.    DEFENDANTS' "DISPUTED FACTS" DO NOT CREATE GENUINE ISSUE OF MATERIAL FACT

1.    <u>Objective evidence defendants contend defeats scienter</u>

In opposing plaintiff's renewed motion for summary judgment, defendants contend that material facts regarding scienter are still very much in dispute.   First, defendants argue that there is a fact dispute regarding plaintiff's claim that GSM made false statements without due diligence and in the face of red flags.  Defendants claim that they did not solely rely on the fraudulent representations of CDL's principals, but relied on seemingly objective evidence.

a.    *"Test investment" prior to marketing CDL's programs*

According to Patrick Cole's affidavit submitted in support of GSM's and Cole's opposition to plaintiff's renewed motion for summary judgment, "I told Kevin Harris that I would invest myself personally to verify the program's authenticity and validity.  My friends and I made an initial investment in CDL's forex program.  Just as promised, we received a handsome return for interest and our initial investments.  To our eyes, ears, and minds, this was a fantastic opportunity that had proven itself legitimate, valid, and real."  ECF 104, Page ID 1874.  Although Cole's affidavit reflects that the test investment was with CDL, his deposition testimony is clear that the test investment was performed with another company called "6K."  Cole considered investing in 6K equivalent to investing in CDL.  The interest rates received in Cole's test investment with 6K were "much higher" than CDL's interest rates.   ECF 107, pp. 142-43.

47

(4:10 CV 2287)

Assuming the facts in a light most favorable to the defendants regarding Cole's

assumption that an investment with 6K was equivalent to an investment with CDL, it may create

a fact dispute regarding GSM's statement to investors that GSM had done its homework.

However, Cole's test investment with 6K, even construed in a light most favorable to defendants,

does not create a material fact dispute with respect to GSM's false and misleading statements to

potential investors that 80% of principal was protected against loss even "if the sky falls," only 3-

5% of investor funds are actually traded in the forex market, investor money was traded by

professional traders with years of experience, CDL had a conservative trading philosophy and

disciplined risk management, and CDL never lost a client's money.

### b. *Wire confirmations and commissions received by GSM from CDL*

Defendants also cite to other evidence that defendants claim creates a material fact

dispute with respect to the issue of scienter.  This undisputed evidence is as follows: GSM

received wire confirmations from CDL of the receipt of investor funds.  GSM's commission

from CDL was based on the amount of money invested in CDL, which included principal

reinvestment at the end of an investment cycle.  GSM invoiced CDL for referral and commission

fees.  CDL paid the invoices, which were deposited into GSM's account and reflected on GSM's

bank statements.  As defendants summarized in their brief opposing plaintiff's renewed summary

judgment motion, "by all appearances, things were progressing smoothly between CDL and GSM

. . . and GSM had "no reason to question the viability of CDL's forex program until near the end

when CDL started to push business away from CDL and over to its own company."

48

(4:10 CV 2287)

However, the undisputed fact that GSM was billing CDL and CDL was paying GSM's commissions is entirely irrelevant to GSM's false and material representations to potential investors regarding CDL's forex program, that is: 80% of principal was protected against loss even "if the sky falls;" only 3-5% of investor funds are actually traded in the forex market; investor money was traded by professional traders with years of experience; CDL had a conservative trading philosophy and disciplined risk management; and CDL never lost a client's money.  The smooth operation of the marketing agreement between CDL and GSM does not create a fact dispute as to the veracity of GSM's statements to potential investors regarding CDL's forex programs.

### c. *Bank and computer records at CDL's offices in Warren, Ohio*

According to Patrick Cole's affidavit submitted in opposition to plaintiff's renewed summary judgment motion, GSM traveled to CDL's offices "to verify that investor funds were being kept in the bank as contractually required. . . . however, we did not go to the bank and inspect first hand.  Instead Kevin Harris showed us the account balances on CDL's computers.  Unbeknownst to us, the computerized bank account was completely fraudulent."  ECF 104, Page ID 1877.  According to Cole's deposition testimony, the online bank statements Kevin Harris showed GSM were balances for a single day.  By its own account, GSM never went to the bank, contacted the bank manager by phone, fax, or e-mail, and never requested bank statements for a period of weeks or months to verify that the 80% rule was being consistently followed.

49

(4:10 CV 2287)

However, even viewing this particular piece of evidence in a light most favorable to defendants, it only establishes that 80% of investor principal was kept in a bank account and not traded.  No material fact dispute is created with respect to defendants' false and material statements that 80% of investors' principal was guaranteed to be returned "even if the sky falls," or that only 3-5% of investor funds are actually traded in the forex market, investor money was traded by professional traders with years of experience, CDL had a conservative trading philosophy and disciplined risk management, and CDL never lost a client's money.

    2.    <u>Investor complaints</u>

In their brief opposing plaintiff's renewed motion, defendants also contend that it is "imperative to remember that no individual investors ever complained to GSM about not receiving their **interest** payments from CDL until after the operation was shut down." ECF 104, Page ID 1863 (emphasis added).  In support of this statement, defendants cite page 203 of Patrick Cole's Rule 30(b)(6) deposition testimony (ECF 107).  In that testimony, Patrick Cole states that GSM never had a complaint that an investor did not get their **principal** back.  However, it is undisputed that Cole's deposition testimony reflects that GSM received multiple complaints from investors regarding problems with **interest** payments and that some of these complaints occurred early on in GSM's marketing program.

    3.    <u>Harris brothers "endorsed" by city officials and community members</u>

Defendants also contend that the endorsement the Harris brothers received from city officials and community members creates a fact dispute as to scienter.  "What influenced us

50

(4:10 CV 2287)

significantly was we were introduced to a number of community leaders, and honestly we were quite bowled over by the endorsement that Kevin got from these persons. We were introduced as Canadian investors so people knew what the context of the relationship was." Patrick Cole Rule 30(b)(6) deposition, p. 139 (ECF 107). Cole testified at his deposition that GSM's thought process at the time was that these individuals would not have given Kevin Harris glowing character references if he had been involved in the type of criminal history that was later revealed.

But even if these character references created a fact issue regarding GSM's and Cole's due diligence with respect to Kevin Harris' criminal history, that fact issue is irrelevant to the material and false representations that GSM made to potential investors regarding the particulars of CDL's forex trading programs regarding guaranteed principal, interest rate, risk, professional experience of forex trading team, et cetera. It is also irrelevant to other items on GSM's due diligence checklist regarding CDL's business practices, such as banking and accounting matters.

4.    Defendants "fact disputes" do not defeat scienter

Defendants also argue summary judgment is not appropriate on the issue of scienter because the defendants did not know about and were not part of CDL's Ponzi scheme, and there is a genuine fact dispute as to whether defendants acted recklessly. In support, defendants point to the record which shows that GSM tried to work with CDL to bring professionalism and integrity to the CDL forex program. ECF 107, p. 32. Further, defendants argue that if they knew CDL was a Ponzi scheme, they would not have suggested an audit by a nationally recognized

51

(4:10 CV 2287)

accounting firm which would have revealed the fraud.  Defendants also argue that some of the

case law plaintiff cites in support of a conclusion that defendants' conduct was reckless does not

apply to this analysis because the defendants in those cases either were or represented themselves

to be experienced in securities and the stock market, and that experience was a consideration in

the analysis of whether defendants' conduct was reckless.

Defendants in this case may not have been experienced in commodities and securities, but

Coles' deposition testimony reflects that forex was all the rage at the time and that he, or people

he knew, had at least dabbled in forex.  Cole knew from this experience that forex traders

sometimes made money and sometimes lost money in their trading.  Cole also knew from his

own experience that some investment programs offering low risk and high returns were frauds,

and recognized that CDL's forex program might be too good to be true.

Further, GSM had important in-house expertise in its principals.  One board member is a

chartered accountant in Canada.  Cole himself is a computer expert and recognizes the value of

the internet as a research tool to gather information.  GSM and its principals also had a collective

expertise which recognized the need for a plan to bring professionalism, integrity, and credibility

to CDL's forex programs, which would in turn benefit GSM's marketing program.

GSM's due diligence checklist and request for an audit by a nationally known accounting

firm reflects without dispute that GSM and Cole understood what steps needed to be taken to

verify and establish the credibility of CDL's forex programs and had the expertise and ability to

do so.  However, the record is replete with Patrick Cole's testimony that time-after-time, GSM

(4:10 CV 2287)

and Cole simply accepted Kevin Harris' representations without taking the steps and making the inquiries that GSM and Cole knew would independently verify the legitimacy of CDL's forex programs.

F.     ANALYSIS SUMMARY - GSM WAS AT LEAST RECKLESS

In summary, no rational fact-finder could find in favor of GSM after considering the totality of the undisputed evidence in the record.  The content of GSM's marketing presentations for CDL's forex programs were prepared based on GSM's discussions with CDL's principals without independent verification. GSM developed a credible due diligence checklist that, if completed by GSM, would have revealed that the content of GSM's presentations regarding CDL's forex programs were false and that Kevin Harris and CDL were frauds.  Instead, GSM did not complete one-third of its due diligence checklist and relied on the representations of CDL's principals regarding the other items without independent verification.

Further, GSM was aware of allegations of fraud regarding CDL and of investor concerns early on in the program.  Based on his own prior experience, Cole realized that some fantastic investment opportunities were frauds and that CDL's investment opportunity may have been too good to be true.  An audit requested by GSM to establish the credibility of CDL's forex programs was a debacle and GSM chose not pursue another audit to establish CDL's credibility.

The record reflects that GSM's and Cole's focus was not on the red flags and independent verification which would have revealed that CDL's investment programs were a fraud.  GSM both ignored the red flags and did not independently verify CDL's information because GSM's

53

(4:10 CV 2287)

focus was on the performance of its marketing contract with CDL.  From this perspective, GSM

had no reason to question CDL.  Defendants' brief in opposition to plaintiff's renewed motion

for summary judgment says it all:

> So by all appearances, things were progressing smoothly between CDL and GSM.
> Customers were investing, CDL was sending notice to GSM, which billed CDL,
> which paid GSM referral commission.  There was no reason to question the
> viability of CDL's forex program until near the end when CDL started to push
> business away from GSM and over to its own company, I3.[26]

GSM's concerns about who would market CDL's forex program - GSM or I3 - has

nothing to do with the viability of the CDL's forex programs or the truth of the statements that

GSM made to potential investors regarding the risks and rewards of investing with CDL.  The

marketing agreement with CDL had only to do with who received the commissions from CDL

for referrals to CDL's investment programs.  There were some aspects of the marketing

agreement with CDL that related to the integrity of CDL's programs, but GSM did not enforce

these provisions and only became concerned about CDL when GSM's exclusive right to market

CDL–and its commissions–were threatened.  Prior to the concern about I3 taking over CDL's

marketing, GSM was content with not knowing whether CDL's programs were actually viable

for investors as long as the commissions kept flowing from CDL to GSM.

---

[26] Patrick Cole Affidavit, par. 10: "Eventually we learned that CDL had formed a new
entity, called [I3] to actually replace GSM as the exclusive marketing agent for CDL.  In
essence, CDL was squeezing GSM out of the picture and replacing it with I3 even though
GSM had an exclusive contract for marketing [CDL's forex programs]."  ECF 104.

(4:10 CV 2287)

In its zeal to earn commissions, GSM not only made false statements about the risk and rewards of CDL's programs, but also made false statements about its own conduct by telling potential investors that GSM had done its homework and taken all precautions in order to persuade the potential investors to invest in CDL.  In fact, GSM had relied on the representations of CDL representatives regarding the risk, return, investment protocols and strategies of CDL's forex programs without independent verification of the accuracy of that information.

The totality of the undisputed evidence in the record is overwhelming that GSM was at least reckless with respect to the fraudulent statements made to potential investors in its presentations marketing CDL's forex programs.  In the face of the undisputed record before the Court, no rational jury could return a verdict in favor of defendants.   As a consequence, the Court concludes that plaintiff is entitled to judgment as a matter of law with respect to GSM's liability for violations of the Act.

G.    COLE IS LIABLE AS GSM'S CONTROLLING PERSON

The Court has concluded that there is no genuine dispute of material fact that GSM was at least reckless in making false and material representations to potential investors regarding CDL's forex programs.  There is no dispute that Cole was GSM's president, CEO and chairman of the board.  Cole's testimony reflects that he was not a figure-head, but deeply involved in GSM's operations.  Cole made the initial contact with CDL to market CDL's forex programs, formed GSM for that purpose, negotiated terms with CDL, and signed the agreement with CDL on behalf of GSM to market CDL's programs.

55

(4:10 CV 2287)

Cole was the principal contact at GSM for CDL.  He prepared the presentation materials for GSM's marketing program and made the presentations to potential investors in CDL's forex programs, and was part of GSM's due diligence team.

It is undisputed that Cole had the power and ability to control GSM's activities upon which the primary violation of the Act is predicated.  Cole was the leader of GSM and directly involved in CDL and GSM's marketing of CDL's forex programs.  Cole was in a position to control GSM's decisions whether or not to pursue CDL's due diligence checklist or to insist that CDL perform an audit, all of which would have revealed to GSM that its statements to potential investors regarding CDL were false.

There is no dispute of material fact that Cole was GSM's controlling person who had the power and ability to control GSM in the activities upon which the primary violation of the Act is predicated.  There is no dispute that Cole had actual knowledge of all of GSM's activities at all levels with respect to CDL, and was the decision-maker regarding GSM's activities upon which the primary violation of the Act is based.

The Court concludes that no rational jury could conclude that Cole was not GSM's controlling person and not liable for GSM's violations of the of the Act pursuant to Section 13(b).  Accordingly, the Court concludes that the Commission is entitled to judgment at a matter of law on its claim that Cole is liable under the Act as the controlling person of GSM.

(4:10 CV 2287)

RELIEF

For the reasons set forth above, the Court finds that there is no genuine dispute of material fact that GSM violated Sections 4b(a)(2)(A) and (C) of the Act and that Cole is liable pursuant to Section 13(b) of the Act as a controlling person of GSM.  Plaintiff requests the following relief against GSM and Cole: permanent injunctive relief, disgorgement, and civil monetary penalty.

A.    PERMANENT INJUNCTIVE RELIEF

Under Section 6(c) of the Act, 7 U.SC. § 13a-1, plaintiff may obtain permanent injunctive relief upon the showing of two things: 1) a violation of the Act has occurred, and 2) there is a reasonable likelihood of future violations.  *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). This statutory injunction may be issued without considering traditional equitable factors such as irreparable harm, and the movant need only show that there is "some reasonable likelihood of future violations." *Hunt*, 591 F.2d at 1220 (citing *SEC v. Advance Growth Capital Corp,* 470 F.2d 40, 54 (7th Cir. 1972); *Commodity Futures Trading Comm. v. British American Commodity Options Corp.*, 560 F.2d 135, 142 (2d Cir. 1977)); *Carnegie Trading,* 450 Supp.2d at 806 (citing *Hunt*, 591 F.2d at 1220).

Past conduct does not necessarily lead to the conclusion of likelihood of future misconduct, but is "highly suggestive" of the likelihood of future violations.  *Hunt* 591 F.2d at 1220 (quoting *SEC v. Management Dynamics, Inc.*, 512 F.2d 801, 807 (2d Cir. 1975)).  In drawing an inference of a reasonable likelihood of future violations from past violations,

57

(4:10 CV 2287)

consideration is given to the totality of the circumstances and whether the violation was

systematic or an isolated occurrence.  Another factor to consider in determining the reasonable

likelihood of future violations is whether the violator maintains that his conduct was blameless.

*Hunt*, 591 F.2d at 1220.

      In this case, the Court concludes that there is a reasonable likelihood that GSM and Cole

will commit future violations of the Act if not enjoined.  GSM's and Cole's violations of the Act

were not an isolated event, but repeated violations over many months.  Further, even though Cole

was aware the CDL investment "opportunity" may have been "too good to be true." and that in

his prior experience some such "opportunities" were frauds, GSM and Cole continually based

their representations to potential investors upon information from CDL representatives without

independent inquiry even in the face of a lawsuit against CDL alleging fraud, investor complaints

to GSM regarding payment from CDL, and an obviously suspicious "audit" of CDL.

      In addition, GSM and Cole view themselves as victims of CDL, and maintain that they

saw no red flags to alert them that CDL was a fraud.  GSM and Cole saw no red flags because

their focus was not on the veracity of their statements to potential investors about CDL's forex

programs, but on the smooth operation of their commission generating marketing agreement with

CDL.  From GSM's and Cole's perspective, the performance of the contract between CDL and

GSM was going along perfectly.  GSM was referring investors to CDL and invoicing CDL for

referral and commission fees, and CDL was paying those fees to GSM.  In fact, GSM and Cole

saw no problems with CDL until GSM perceived in 2008 that they were being pushed away by

58

(4:10 CV 2287)

CDL in favor of another marketing firm–I3.  As long as GSM was collecting seven figure fees

from CDL and receiving preferred interest rates, GSM and Cole did not see–or did not want to

see–problems with CDL, and this errant focus creates a reasonable likelihood of future

violations.

      The record is replete with red flags concerning possible dangers to potential investors.

However, GSM's and Cole's focus was not on vetting CDL and being alert for red flags to avoid

misleading and harming potential investors, but on their own profitable relationship with CDL.

      Because of the extended period of time over which GSM and Cole violated the Act, and

because GSM and Cole view themselves as victims of CDL, and because GSM's and Cole's

focus was on their own profitable relationship with CDL and not on the danger of misleading

potential investors who were the targets of their false and misleading representations regarding

CDL's forex program, the Court concludes in its discretion that there is a reasonable likelihood

of future violations if a permanent injunction is not issued against GSM and Cole.

      Accordingly, defendants GSM and Patrick Cole, and their agents, servants, employees,

assigns, attorneys and persons in active concert or participation with GSM and Patrick Cole,

including any successor thereof, is hereby permanently enjoined from engaging, directly or

indirectly:

      (i) in conduct in violation of Sections 4b(a)(2)(A) and (C) of the Act, as amended by the
CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C); and

      (ii) trading on or subject to the rules of any registered entity (as that term is defined in
Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006));

(4:10 CV 2287)

(iii) entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

(iv) having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

(v) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

(vi) soliciting, receiving, or accepting any funds from any person for purposes of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

(vii) applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

(viii) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

B.    DISGORGEMENT

Plaintiff has further requested equitable relief in the form of disgorgement of funds

received by defendants in connection with their violations of the Act.  In this case, there is no

dispute in the record that GSM received at least $1,146,399 in referrals and commissions from

CDL.  Equitable remedies such as disgorgement are available under the Act.  *CFTC v.*

*Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 193 (4th Cir. 2002) (well-settled that equitable

remedies such as disgorgement available to remedy violations of the Act); *CFTC v. First Capitol*

*Futures Grp.,* 2010 WL 1713617 at * 11 (W.D. Mo. Feb. 18, 2010) (awarding disgorgement in

60

(4:10 CV 2287)

full amount of defendants' commissions and fees).  In cases where the controlling person is "intimately involved" in the fraud, that individual may be held jointly and severally liable for the disgorgement.  *See SEC v. U.S. Environmental, Inc.,* 2003 WL 21697891 at * 26 (S.D.N.Y. July 21, 2003) (citing *First Jersey Sec.,* 101 F.3d 1450, 1475-76 (2d Cir. 1996)).

In this case, the Court has concluded there is no material fact dispute that Cole was more than just GSM's controlling person.  Cole was GSM's primary contact with CDL and "intimately involved" in GSM's marketing presentations of CDL's forex programs, all aspects of GSM's relationship with CDL, and with GSM's violations of the Act.

Accordingly, the Court exercises its discretion to impose the equitable relief of disgorgement of GSM's profits gained from its violations of the Act in the amount of $1,146,399, plus pre-judgment and post-judgment interest.  Further, because defendant Patrick Cole was not only GSM's controlling person, but "intimately involved" in GSM's violations of the Act, the Court further exercises its discretion to hold Patrick Cole jointly and severally liable for the disgorgement amount.

C.    CIVIL MONETARY PENALTY

The Court has jurisdiction under the Act to impose a civil monetary penalty based on each violation of the Act.  7 U.S.C. § 13a-1(d)(1)(A).  Civil monetary penalties further the Act's remedial policies and deter others from committing similar violations.  *Vandeveld*, 2007 WL 2723307 at * 9.  Some courts have imposed a civil monetary penalty of three times each violation of the Act, and other courts have computed the civil monetary penalty by tripling the monetary gain received by the defendants.  *See e.g. CFTC v. Millenium Trading* Group, 2007 WL 2639474

61

(4:10 CV 2287)

(E.D. Mich. Sept. 6, 2007); *Carnegie Trading Group,* 450 F.Supp.2d at 807-08 (civil penalty imposed of three times the disgorgement amount).  Plaintiff in this case seeks a civil monetary penalty in the amount of three times the disgorgement amount.

In this case, defendants' fraudulent solicitations of investors for CDL's forex program spanned many months.  The record reflects that an absolute determination of numbers and amounts in this case has not been possible.  However, even at defendants' most conservative estimate, defendants fraudulently solicited over 200 individuals to invest in CDL's forex programs.  GSM received at least $1,146,399 in commission from CDL, which the Court has ordered disgorged.

The number of investors solicited over an extended period of time and amount of commissions received warrants the imposition of civil monetary penalty, however, the recordkeeping issues in this case deters the Court from imposing a per violation penalty.  Accordingly, the Court has determined to award a civil monetary penalty in the sum of $1,146,399, plus pre-judgment and post-judgment interest.  This sum equals to the amount of commissions earned by GSM which the Court has ordered disgorged, and under the circumstances of this case, is appropriate to further the Act's remedial policies.  For the reasons set forth above, GSM and Patrick Cole are jointly and severally liable for payment of the civil monetary penalty imposed by the Court in the amount of $1,146,399, plus pre-judgment and post-judgment interest.

(4:10 CV 2287)

MISCELLANEOUS MATTERS

A.     RAK PALACE RENT-A-CAR

The Court's review of the docket reveals that there is no evidence on the record that the Commission has perfected service on Relief Defendant RAK Palace Rent-A-Car.  Accordingly, Relief Defendant RAK Palace Rent-A-Car is dismissed from this lawsuit for want of prosecution.

B.     CROSS-CLAIMS

Defendants Global Strategic Marketing and Patrick Cole filed an answer to plaintiff's complaint and filed cross-claims against defendants Complete Developments, LLC, Keelan Harris, Kevin Harris, Investment International Inc. and Karen Starr (collectively, Cross Defendants).  ECF 14.  However, the record does not reflect that cross-claimants Global Strategic Marketing and Patrick Cole have pursued their cross-claims against the Cross-Defendants.

Accordingly, Global Strategic Marketing's and Patrick Cole's cross-claims against the Cross Defendants, Complete Developments, LLC, Keelan Harris, Kevin Harris, Investment International Inc. and Karen Starr, are hereby dismissed for want of prosecution.

CONCLUSION

For the reasons discussed above, the Court concludes that there is no genuine dispute of material fact and the Commission is entitled to summary judgment as a matter of law that defendant Global Strategic Marketing is liable for fraud under the Act and that defendant Patrick Cole is also liable under the Act as a controlling person of Global Strategic Marketing. Accordingly, plaintiff's renewed motion for summary judgment is GRANTED.

(4:10 CV 2287)

The Court also concludes for the reasons discussed above that there is a reasonable likelihood that defendants Global Strategic Marketing and Patrick Cole will violate the Act in the future if not permanently enjoined, and the Court will separately publish an Order of Permanent Injunction.

Further, for the reasons discussed above, the Court concludes that plaintiff is entitled to the relief of disgorgement in the sum of $1,146,399, plus pre-judgment and post-judgment interest, and concludes that defendants Global Strategic Marketing and Patrick Cole are jointly and severally liable for the disgorgement of that sum to the Commission.

Further, for the reasons discussed above, the Court concludes that plaintiff is entitled to the relief of a civil monetary penalty in the sum of $1,146,399, plus pre-judgment and post-judgment interest, and concludes that defendants Global Strategic Marketing and Patrick Cole are jointly and severally liable for payment of civil monetary penalty to the Commission.

Further for the reasons discussed above, Relief Defendant RAK Palace Rent-A-Car is DISMISSED from this case for want of prosecution.

(4:10 CV 2287)

Further for the reasons discussed above, the cross-claims of defendants Global Strategic Marketing and Patrick Cole against cross defendants Complete Developments, LLC, Keelan Harris, Kevin Harris, Investment International Inc. and Karen Starr, are hereby DISMISSED for want of prosecution.


IT IS SO ORDERED.


  February 26, 2014                               s/ David D. Dowd, Jr.
Date                                            David D. Dowd, Jr.
                                                U.S. District Judge

65